UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------

HELENE K. TOBIN,

                              Plaintiff,          **FINDINGS OF FACT AND**
                                                  **CONCLUSIONS OF LAW**
                    v.                            07-CV-1605 (MKB)
                                                  11-CV-3985 (MKB)

IVAN GLUCK and PHYLLIS GLUCK,

                              Defendants.

-------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

         Plaintiff Helene K. Tobin commenced the above-captioned action against Defendants

Ivan and Phyllis Gluck on April 18, 2007, pursuant to a guaranty from Defendants to Plaintiff in

connection with the lease of a commercial property owned by Plaintiff ("*Tobin I*"). Plaintiff's

Amended Complaint asserted claims of fraud, unjust enrichment and breach of a guaranty, and

sought damages and legal fees. On June 17, 2011, Defendants commenced an action in New

York State Supreme Court, Nassau County, to enforce a stipulation of settlement signed by the

parties, resulting from a landlord and tenant proceeding involving the property. The Nassau

County action was removed to this Court on August 17, 2011 ("*Tobin II*").[1] After granting

Defendants' motion for summary judgment and dismissing Plaintiff's claims in *Tobin I*, and

allowing Plaintiff to amend the Amended Complaint to assert a breach of contract claim based

on the stipulation of settlement, on December 15, 2014, the Court held a consolidated bench trial

of *Tobin I* and *Tobin II*. Defendants' motion for partial summary judgment is also before the

Court. As set forth below, the Court denies Defendants' motion for partial summary judgment;

---

[1] These cases were transferred to the undersigned on March 30, 2012.

finds that Defendants breached certain terms of the stipulation of settlement; and awards damages to Plaintiff in the amount of $604,500.00 less: (1) $17,421.02, which represents the value of the security deposit with interest as set forth in the Stipulation; and (2) the value of any interest accrued to date on the $17,421.02 amount.

## I. Procedural History

The Court assumes familiarity with the long and tortured history of these proceedings, detailed in the Court's March 28, 2014 Memorandum and Order granting summary judgment to Defendants, dismissing Plaintiff's claims and allowing Plaintiff to plead a breach of contract claim based on the stipulation of settlement between the parties. *See generally Tobin v. Gluck*, 11 F. Supp. 3d 280 (E.D.N.Y. 2014).

Defendants moved for partial summary judgment prior to the commencement of trial. The Court declined to rule on the motion and instead proceeded to trial. Defendants argue that they are entitled to partial summary judgment dismissing: (1) Plaintiff's environmental claim which alleges that Defendants contaminated the subsoil and groundwater of the Property in violation of paragraph 5 of the Stipulation; (2) Plaintiff's claim that Defendants violated paragraph 4 of the Stipulation by failing to maintain insurance on the Property; and (3) Plaintiff's claim that Defendants violated paragraph 2 of the Stipulation by seeking the entry of a judgment against Plaintiff in civil court for the return of the security deposit. (Defs. Not. of Mot. for Partial Summary Judgement, Docket Entry No. 138; Defs. Mem. in Support of Mot. for Partial Summary Judgement ("Defs. SJ Mem."), Docket Entry No. 138-10.) As discussed below, the Court denies Defendants' motion as to Plaintiff's environmental claim pursuant to paragraph 5 of the Stipulation, as Plaintiff has proven this claim. The Court denies Defendants' motion as to the other two claims as moot since the Court resolves these claims on the merits.

On December 15, 2014, the Court commenced a bench trial of Plaintiff's breach of contract claim relating to the stipulation of settlement. Plaintiff presented the testimony of Gerald Tobin, manager of the property and Plaintiff's husband,[2] professional engineer Neil Schmelkin of Tauscher Cronacher Engineers, and hydrogeologist Mostafa El Sehamy of Hydro Tech Environmental Corp. Defendants presented the testimony of geologist James DeMartinis. At the conclusion of the trial, on December 16, 2014, the Court heard oral argument on Defendants' pending motion for partial summary judgment. The parties subsequently submitted post-trial briefs.

The Court makes the following findings of facts and conclusions of law.

## II. Findings of Fact

Plaintiff Helene K. Tobin is the owner of the lot located at 3480 Nostrand Avenue, Brooklyn, New York (the "Property"). (Tr. of Dec. 15, 2014 Bench Trial ("Tr.") 14:7–18.) The Property consists of a building (the "Building") and a surrounding outdoor space (the "Outdoor Space"). (Tr. 72:3–9; Ex. 1.) The Building is a two-story building with a full basement. (Ex. G at 2; Ex. J at 2; Ex. H at 2.) On July 1, 1997, Plaintiff leased the Property to tenant Clean-o-Rama, Inc., for a term of fifteen years. (Tr. 15:9–11; Lease, admitted as part of Ex. A.) On April 10, 2002, Plaintiff agreed to an assignment of the lease from Clean-o-Rama, Inc., to Beaaro, Inc. ("Beaaro").[3] (Tr. 15:15–20; Assignment of Lease, admitted as part of Ex. A.)

Pursuant to the lease, Beaaro paid Plaintiff a security deposit in the amount of

---

[2] Tobin testified that Plaintiff has owned the Property "probably in excess of . . . twenty-five years" and, throughout this time, Tobin has managed the Property for Plaintiff and he continues to do so at present. (Tr. 14:7–15:8.)

[3] Defendant Ivan Gluck is the President of Beaaro and, together with Defendant Phyllis Gluck, he executed a guaranty which guaranteed certain provisions of the lease. *Tobin v. Gluck*, 11 F. Supp. 3d 280, 285 (E.D.N.Y. 2014).

$15,000.00.  (Lease Modification Agreement, admitted as part of Ex. A at ¶ 6.)  Plaintiff has retained the security deposit, including accrued interest, and has not returned it to Beaaro or Defendants.  (Tr. 8:16–10:4.)

In or about February of 2005, Plaintiff commenced a holdover proceeding in New York Landlord/Tenant Court, Index No. L&T 06K070405, alleging a default under the Lease (the "L&T Action").  (Stipulation, Ex. B at 1; Tr. 73:8–13.)  Plaintiff commenced the action against then-tenant Beaaro, several under-tenants identified only as John Does # 1–5, and UVW and XYZ Corps. (collectively, the "tenants").  (Stipulation 1.)  Defendants were not named as parties in the L&T Action.  However, in settlement of the L&T Action, on or about July 3, 2007, Plaintiff, Defendants, the tenants, and two individuals associated with the tenants — all of whom were represented by counsel — entered into a stipulation of settlement (the "Stipulation") "to resolve and settle their disputes amicably."  (*Id.* at 2, 8.)  The Stipulation was "So Ordered" by Judge Loren Baily Schiffman on July 19, 2007.  (*Id.* at 9.)

### a.  The Stipulation

The caption of the Stipulation states in pertinent part: "Premises Address: 3480 Nostrand Avenue, Brooklyn, New York."  (*Id.* at 1.)  Pursuant to the Stipulation, Plaintiff obtained a judgment of possession and a warrant of eviction but agreed not to execute the warrant prior to August 2, 2007, if Defendants complied with the terms of the Stipulation.  Paragraph 1 of the Stipulation provides:

> A judgment of possession and warrant of eviction shall issue and shall be entered forthwith.  Petitioner covenants and agrees that she shall not execute the warrant or cause it to be executed prior to August 2, 2007, so long as there is due and timely compliance with the terms of this stipulation by the respondent and its principals, agents, officers, employees, agents, successors or assigns.  The warrant may be executed at any time after that date, unconditionally and without further notice and may be executed prior to that date if

4

any of the terms and conditions of paragraphs 3 or 4 are not timely complied with, upon service of the requisite notice by a marshal, sheriff or other appropriate enforcement officer.

(*Id.* ¶ 1.) Pursuant to the Stipulation, Defendants agreed to surrender the Property on or before

August 2, 2007. Paragraph 5 of the Stipulation provides in pertinent part:

> Not later than August 2, 2007 all respondents, and each of their principals, agents, officers, employees, shareholders and all persons claiming under them shall surrender possession of the captioned premises to the petitioner, empty, broom clean, in good order, condition and repair, except for ordinary wear and tear. Respondent shall deliver the keys to the undersigned attorney for the Tobins, which shall constitute surrender of the premises, but not acceptance of the surrender, unless and until the landlord, his agents or assignees inspect the premises for compliance with the terms of this paragraph, and determine that there has been full, due and timely compliance.

(*Id.* ¶ 5.) The Stipulation also provided that if Defendants surrendered the Property by August 2,

2007 and complied with the terms of the Stipulation, Plaintiff would return Defendants' security

deposit in the amount of $17,421.02, which included accrued interest. Paragraph 5 of the

Stipulation provides in pertinent part:

> Upon (a) surrender of the premises; (b) landlord's inspection thereof, and (c) full and timely compliance by Beaaro, Ivan Gluck, Phyllis Gluck, Kenneth Gluck and Daniel Gluck with the terms of this stipulation (including payment of all payments provided for in paragraphs 3, 6 and 7 hereof and resolution of the environmental issues described in paragraph 7), the landlord shall tender to Kenneth Frenkel, Esq., a check payable to Beaaro in the amount of $17,421.02, which represents the security deposit heretofore held by the landlord, including accrued interest thereon and, upon such tender, the landlord, her agents and employees shall be released from all liability, if any, relating to said security deposit and/or interest.

(*Id.* ¶ 5.) Although the Stipulation did not require Defendants to pay rent for the month of July

2007 or the first two days in August of 2007 — the period from the signing of the Stipulation

through the expected surrender date — Beaaro was required to reimburse Plaintiff for certain

expenses incurred through the date of surrender, including real estate taxes, the water and sewer bill and "all other state and local impositions, fees and violations, if any, . . . as they come due . . . provided, however, that Beaaro shall not be responsible for any other violations, if said violations are attributable solely to periods after surrender of possession by the respondents and acceptance of possession by the petitioner." (*Id.* ¶ 3.) The Stipulation also required Beaaro to maintain insurance coverage for the Property through August 2, 2007. (*Id.* ¶ 4.)

The Stipulation specified that although August 2, 2007 was the surrender date, delivery of the keys on that date would constitute surrender "but not acceptance of the surrender, unless and until the landlord, . . . inspect[s] the premises for compliance with the terms of this paragraph, and determine[s] that there has been full, due and timely compliance."[4] (*Id.* ¶ 5.) The Stipulation also required Beaaro to pay Plaintiff $250,000 in full satisfaction of Plaintiff's claim pursuant to the lease and guaranty agreements on or before August 2, 2007. (*Id.* ¶ 6.)

The parties to the Stipulation agreed to exchange releases upon execution of the Stipulation, to be retained in escrow by their attorneys. (*Id.* ¶ 9.) The parties also agreed to discontinue the then-pending Supreme Court, Kings County actions (index numbers 22203/06 and 17943/04), (*id.* ¶¶ 10–11), and to notify the Court in *Tobin I* that they had reached a

---

[4] Among the conditions for Plaintiff's acceptance of surrender was the resolution of particular "environmental issues," related to the water service pipe at the Property, which had been detected by the New York City Department of Environmental Protection ("DEP"). (Stipulation ¶¶ 5, 7; *id.* at "Exhibit B.") On July 7, 2006, DEP sent a letter to Plaintiff advising her that, because a backflow prevention device had not been installed in the water service pipe, the Property posed a potential hazard to the City water supply. (Stipulation at "Exhibit B.") The DEP had ordered Plaintiff to initiate the process of installing a backflow prevention device within thirty days. (*Id.*) This was not done, and on February 23, 2007, the DEP issued an order directing Plaintiff to complete the installation of a backflow prevention device within thirty days and advising Plaintiff that failure to comply could result in the imposition of a $1000 fine and termination of the water supply to the Property. (*Id.*) The DEP order was appended to the Stipulation as Exhibit B and Defendants were required to comply with the order by September 2, 2007. (*Id.* ¶ 7.)

settlement in principle, (*id.* ¶ 12). The parties further agreed to notify the Appellate Division, where a motion was then pending, of their resolution. (*Id.* ¶ 13.)

With regard to Plaintiff's acceptance of surrender, paragraph 5 of the Stipulation provides that Plaintiff was required to inspect the Property within fourteen days of the surrender of the Property. (*Id.* ¶ 5.) Plaintiff was also required to return the security deposit within three days after the latter of:

> (a) such inspection, but only if it shows full compliance with requirements of this paragraph relating to the condition of the premises at the time of surrender; (b) the receipt by the landlord of any reports from any professionals inspecting the premises (including plumbers, electricians and engineers) but only if it shows full compliance with requirements of this paragraph relating to the condition of the premises at the time of surrender; and (c) resolution of the environmental issue described in paragraph 7 hereof and the confirmation by the appropriate governmental agencies that such issue has been resolved.

(*Id.* ¶ 5.)

### b. Parties' actions after the Stipulation

Pursuant to the Stipulation, Defendants surrendered the Property on August 2, 2007. (Tr. 30:18–23.) Defendants also reimbursed Plaintiff for certain expenses expected to be incurred through the surrender date on August 2, 2007, which expenses were itemized in paragraph 3 of the Stipulation. (Stipulation ¶ 3.) By letter dated July 20, 2007, Defendants' counsel sent Plaintiff's counsel a check in the amount of $2108.75, representing the "pro rata portion of real estate taxes and water and sewer bill for the month July 2007." (Ex. C; Tr. 19:4–20:20.) That letter also states that, pursuant to paragraph 4 of the Stipulation, it "enclosed a letter of continuity of insurance without lapse as required which has already been forwarded to your client previously under separate cover by the insurance company." (Ex. C.) However, although the July 20, 2007 letter references an enclosed "letter of continuity of insurance," only the single-

paged July 20, 2007 letter was admitted as an exhibit during the trial.  (*Id.*)  Gerald Tobin

(hereinafter "Tobin") testified that on January 23, 2006 and June 26, 2007, Plaintiff received

notifications from St. Paul Travelers, (Ex. D), and Argonaut Insurance Company, (Ex. F),

respectively, advising her that the Property's insurance coverage had lapsed.  (Tr. 27:23–28:20,

82:4–84:2.)  After receiving the January 23, 2006 notification of the lapse in coverage, Plaintiff

purchased new insurance coverage for the Property.  (Tr. 29:2–23, 84:3–13.)

### i.    Condition of the Property at the time of surrender

#### 1.    Condition of the Building and Outdoor Space

After the surrender of the Property on August 2, 2007, Tobin and Neil Schmelkin

inspected the Property; Tobin on or about August 5, 2007, (Tr. 31:3–11, 90:3–5), and Schmelkin

on August 9, 2007, (Tr. 103:7–104:6; Ex. G at 2).  Tobin and Schmelkin made the following

observations during their inspections: there were electrical wires that were "loose throughout the

walls," (Tr. 33:24–34:7); the sidewalk was "broken" and, according to Tobin, the City of New

York issued a violation notice, (Tr. 34:18–22); large trees were growing out of the foundation on

the side of the Building, (Tr. 34:18–25); "all kinds of trash" including "equipment from a

drycleaner [and] concrete," had been discarded in the Outdoor Space at the Property, (Tr. 34:25–

5:2); concrete columns that were not present when the Property was leased had been erected in

the basement, (Tr. 36:21–37:9; 106:5–15); between six and seven inches of standing water was

present on the floor in the basement, (Tr. 46:14–47:1); and a gas-fueled heating unit, which had

been attached to the ceiling of the Building's first floor, had been removed and the gas pipes that

were once connected to the unit had been detached and remained on the ceiling, (Tr. 36:1–15,

106:18–107:16; Ex. G at 9).

Schmelkin prepared a report on August 16, 2007, a few days after his inspection of the

Property.[5]  (Tr. 103:7–104:11; Ex. G.)  As to the "structural" condition of the Building, the report noted the presence of "some floors that slope, door frames that are not plumb, cracks in interior surfaces, [and] separations between floor and base moldings," all of which was attributable to "settlement and movement that has occurred" and is "very common in structures of this age group."  (Ex. G at 6.)  The report recommended various "[s]tructural repairs and upgrading," including: "sealing the cracks in the foundation walls, both inside and outside;" "[b]rushing clean, neutralizing and painting with cement based waterproofing paint, the spalling sections of foundation walls;" "[s]craping and painting of all the steel members with two coats of rust inhibiting paint;" and removal of the concrete columns erected in the basement.  (*Id.* at 6.) The report described the cracks in the foundation walls as a "condition that is not serious and can be readily corrected by a good handyman.  It should be noted that many foundation walls do develop cracks. . . . [and] the degree of cracking in these premises does not indicate a major structural defect."  (*Id.*)  Schmelkin's 2007 report did not include estimates as to the cost of addressing the conditions that the report indicated required "rehabilitation," "replacement" or "repair."  (*Id.* at 19.)

Subsequently, in either late 2007 or the beginning of 2008, the water in a sprinkler pipe in

---

[5]  According to the report, Schmelkin's "inspection / evaluation [was] intended to provide an overview of the condition of the [B]uilding and its common elements based on patterns of problems and overall areas or conditions requiring repair, replacement or any other corrective action." (Ex. G at 3.)  The report also explains that it was "not intended to be an exhaustive analysis of each and every problem and unsatisfactory condition existing within the [B]uilding." (*Id.*)  The report also notes that it "has been prepared from the perspective of what an owner of this property would benefit from knowing.  Thus, it discusses many things beyond those which are of immediate concern.  Therefore, the report needs to be read in its entirety to understand fully all of the information that has been obtained."  (*Id.* at 18.)

the Building froze and the pipe burst.[6] (Tr. 44:12–45:5, 52:22–24.) Plaintiff did not check the pipes at the time of the surrender, and therefore did not know whether there was water in the pipes at that time, or if the water had instead been drained.[7] (Tr. 97:18–98:2.) Tobin was aware that if there was water in the pipes and the heat was not turned on during the cold months, there was a danger that the pipes could burst and cause a flood. (Tr. 54:7–12.) Plaintiff did not turn the heat on in the Building during the period between August 2, 2007 and the time when the sprinkler pipe froze and burst. (Tr. 95:16–97:17.)

On February 23, 2012, Schmelkin again visited the Property, this time "for the sole purpose of [conducting an] examination of the [B]uilding's structural system, and plumbing systems, for the purpose of proposing cost estimates for the work needed to bring the [B]uilding into a usable condition, and comply with typical standards of construction codes . . . ." (Ex. H at 2; Tr. 110:25–112:2.) Schmelkin examined the Building's "basement, first floor, second floor, roof, and exterior walls." (Ex. H at 2.) Schmelkin prepared a report following this visit, which he signed on August 9, 2012.[8] (*Id.* at 5.) Schmelkin's 2012 report noted that, "[t]he [B]uilding

---

[6] Tobin testified that, after the pipes froze and burst, the Property flooded. (Tr. 45:7–8, 52:18–24.) The Court notes that Tobin had no personal knowledge of a flood and that he testified to this fact based on telephone calls he received advising him that there was a flood at the Property and water was coming out of the front door. (Tr. 45:7–13.) The Court is not accepting this testimony for the truth of the matter asserted, but rather to explain Tobin's actions thereafter. (Tr. 46:1–5.)

[7] Although this was not established by testimony or other evidence, Plaintiff's counsel told the Court that the Property has not been leased to another tenant and has been empty since it was surrendered by Defendants. (Tr. 48:16–49:9.)

[8] Defendants filed a motion *in limine* to preclude Schmelkin's 2012 report, (Defs. SJ Mem. 13–22), and objected to the admission of Schmelkin's 2012 report, (Tr. 108:6–109:12), and to his certification as an expert as to the cost of repairing defective conditions at the Property, (Tr. 102:21–24). After hearing the parties' arguments as to the relevance of Schmelkin's 2012 report and clarifying the circumstances under which the report was prepared,

is in an abandoned, and neglected, and vacant condition, and does not appear to have been properly maintained in recent years." (*Id.* at 3.) The report included the estimated cost of repairing conditions categorized as either "structural" or "plumbing / fire sprinkler system." (*Id.* at 3–4.)

Three of the estimates in Schmelkin's 2012 report pertain to conditions relating to the Building's foundation walls and steel members that were noted and described consistently in both the 2007 and 2012 reports. Schmelkin recommended sealing cracks to the foundation walls in both 2007 and 2012. (Ex. G at 6; Ex. H at 3.) Schmelkin testified that twenty percent of the foundation wall cracks were attributable to ordinary wear and tear and the rest were due to water leakage. (Tr. 131:10–132:14.) The cost of sealing cracks attributable to water leakage was estimated at $2400. (Tr. 137:23–138:5.) Both reports also recommended "[b]rushing clean, neutralizing and painting with cement based waterproofing paint" the spalling sections of the foundation walls. (Ex. G at 6; Ex. H at 3.) Schmelkin estimated that these repairs would cost $1500. (Ex. H at 3.) Schmelkin did not know whether the recommended spalling-section repairs were attributable to ordinary wear and tear. (Tr. 138:15–20.) Finally, both the 2007 and 2012 reports recommended scraping the Building's "steel members" and painting them with rust-inhibiting paint. (Ex. G at 6; Ex. H at 3.) These repairs were recommended to address rust caused by water leakage, (Tr. 139:1–10), and, in 2012, Schmelkin estimated this would cost $2500, (Ex. H at 3).

Both the 2007 and 2012 reports note the concrete columns in the basement. (Ex. G at 6;

---

(Tr. 109:16–119:5), the Court admitted Schmelkin's 2012 report but advised the parties that it would disregard items included in Schmelkin's 2012 report that were not included in Schmelkin's 2007 report unless Plaintiff presented evidence to substantiate a basis for relying on the items raised for the first time in the 2012 report, (Tr. 119:6–121:9).

Ex. H at 4.) As distinct from the 2007 report, the 2012 report notes not only the presence of concrete columns but also that the "steel supports are badly rusted in this area and will require rebuilding." (Ex. G at 6; Ex. H at 4; Tr. 124:24–126:1.) The estimated cost of addressing the concrete columns and rusted steel supports was $18,000 to $25,000. (Ex. H at 4.) The 2012 report also includes a cost estimate relating to "badly rotted basement ceiling jousts" which are not mentioned in the 2007 report. (Tr. 128:10–18; Ex. H at 4.) The 2012 report also estimates the cost of repairs to the plumbing and fire sprinkler systems necessitated by the burst pipe and flood in late 2007 or early 2008, after the Property had been surrendered. (Tr. 116:17–117:18, 128:19–129:12; Ex. H at 4.)

Tobin testified that Plaintiff hired a company to remove the trash and equipment that had been discarded in the Outdoor Space at a cost of $1500. (Tr. 41:5–8.) Plaintiff also spent approximately $3000 to remedy the standing water that was present in the basement during Tobin's post-surrender inspection. (Tr. 47:3–7.)

## 2. Groundwater contamination

Shortly after the surrender of the Property on August 2, 2007, Plaintiff retained Hydro Tech Environmental, Corp. ("Hydro Tech") to conduct testing at the Property to determine whether the Property had been contaminated with chemicals. (Tr. 147:1–148:11.) On August 16, 2007, Hydro Tech employees "under the direct guidance and oversight of a Hydro Tech [g]eologist" went to the Property and, in the basement, used a probe to collect samples of the soil and groundwater beneath the basement floor. (Tr. 152:5–23, 174:2–176:17, 186:5–17; Ex. J at 4.) Four soil samples and two groundwater samples were collected. (Ex. J at 4–5.) The soil and groundwater samples were then analyzed by a laboratory and, on September 20, 2007, Hydro Tech prepared a "Focused Subsurface Investigation Report" outlining the results of the analysis

of the samples. (Ex. J.) According to the report, "[t]he scope of work for this assessment was based upon client requirements" set by Tobin, the client, and "[t]he purpose of the Focused Subsurface Investigation is to assess the potential impact to the Subject Property from the historical utilization of the Subject Property as dry cleaning operations." (*Id.* at 2.)

The analysis of the subsoil and groundwater samples indicated that tetrachloroethene was present in one of the soil samples and both groundwater samples. (*Id.* at 7, 9.) The Hydro Tech Report indicates that "[t]etrachloroethene is a manufactured chemical compound that is widely used for the dry cleaning of fabrics" and concluded that "[t]he presence of tetrachloroethene in the soil is related to the former utilization of the site as a dry cleaner" and "[t]he source of tetrachloroethene in the groundwater is most likely related to the former utilization of the Site as a dry cleaner." (*Id.* at 9; Tr. 148:6–149:17, 155:24–156:8.) According to the Hydro Tech report, although tetrachloroethene was detected in one of the soil samples, the concentration was below the threshold for contamination requiring remediation set by the New York State Department of Environmental Conservation ("NYSDEC"). (Ex. J at 1, 9; Tr. 148:8–149:13.) However, the Hydro Tech report indicated that the concentration of tetrachloroethene in the groundwater samples was greater than the concentration in the soil sample and was sufficiently high to surpass the NYSDEC threshold for contamination requiring remediation. (Ex. J at 1, 9; Tr. 148:6–149:17.)

On October 31, 2007, Hydro Tech visited the Property again to investigate further by installing monitoring wells which Hydro Tech used to collect additional groundwater samples. (Tr. 174:10–14.) High concentrations of chlorinated solvents were detected in the groundwater samples drawn from the monitoring wells. (Tr. 150:8–19.)

El Sehamy and DeMartinis provided expert testimony on behalf of Plaintiff and

Defendants, respectively, and disagreed about: the source of the contamination generally, what the results of Hydro Tech's tests indicated with respect to the likelihood of an on-site versus off-site source of any contamination, the rate of groundwater flow and extent to which flow is altered by introduction of contaminant, and the best method and likely cost of remediating contamination. The Court, finding El Sehamy to be a more credible witness and the substance of his testimony to be more internally consistent and informed by Property-specific testing, credits El Sehamy's testimony over that of DeMartinis.[9]

El Sehamy testified that the results of the testing conducted by Hydro Tech indicated that the source of the tetrachloroethene detected in the soil and groundwater samples was the

---

[9] Though Defendants called DeMartinis as an expert witness, DeMartinis did not prepare a report. As this was a bench trial, and given that Plaintiff had deposed DeMartinis, the Court allowed testimony from DeMartinis on matters about which he had been deposed by Plaintiff. The Court finds that DeMartinis' testimony lacks probative value and therefore declines to credit his testimony.

Critically, DeMartinis never visited the Property or conducted any tests relating to the Property. (Tr. 224:3–225:11, 236:13–237:4, 244:15–18, 246:8–12, 248:19–7, 251:5–6.) Rather, the sole basis for DeMartinis' testimony was his review of the 2007 Hydro Tech report. (Tr. 230:8–20, 237:1–7, 244:19–20, 251:10–15, 258:11–19.) DeMartinis opined that, based on his review of the 2007 Hydro Tech report, the source of the tetrachloroethene detected in the subsoil and groundwater samples was not within the basement because the Hydro Tech report did not indicate that the basement floor was stained or that it had a hole which, DeMartinis claimed, would evidence the dumping of chemicals within the basement. (Tr. 231:9–15, 251:16–252:8.) DeMartinis testified that the Hydro Tech report failed to identify the source of the contamination which, DeMartinis claimed, undermined El Sehamy's testimony as to the appropriate method and likely cost of remediation. (Tr. 230:8–232:13.) DeMartinis then speculated as to various potential sources of the contamination without offering any affirmative, credible evidence in support of his testimony or any credible basis for believing his testimony. For example, DeMartinis posited that the backyard could be the source of the contamination because backyards are "generally where people would put . . . drums and garbage" as distinct from the basement, in this case, because "I believe most dry cleaners have working basement. In other words, they have machines in the basement. Not necessarily dry cleaning machines, but they have washers, dryers, they have people." (Tr. 237:8–24.) DeMartinis also speculated that the source of the contamination could be an off-site dry cleaner because, "if you go northwest of the [P]roperty, you're up on Avenue U, for instance. There are a lot of dry cleaners up there that existed at one time or still exist. So [the contamination] could be coming from an off-site source." (Tr. 232:9–12.)

Property itself. (Tr. 173:15–18, 179:14–180:9.) El Sehamy's conclusion — that the source was located on the Property — was based on the sample results and, specifically, the relatively low concentration of tetrachloroethene in the soil coupled with the high concentration detected in the groundwater. (Tr. 173:15–18, 179:14–180:4.) El Sehamy explained that the sample results indicated an on-site source given the properties of tetrachloroethene and its behavior when introduced into soil and water. He explained that tetrachloroethene is heavier than water such that, in the event of a spill, it does not absorb into the soil and instead it seeps directly into the water and stays in the water. (Tr. 156:11–15, 264:21–266:13.) El Sehamy explained that tetrachloroethene's behavior in water depends on whether tetrachloroethene is introduced into water in its pure form or mixed with other chemicals and introduced into water. If pure tetrachloroethene is introduced into water it striates and, because tetrachloroethene is heavier than water, it will settle to the bottom of the water. (Tr. 156:11–158:9.) If tetrachloroethene is mixed with other chemicals and is not in its pure form upon introduction into the water table it will not striate and will instead move with the groundwater in the direction of groundwater flow. (Tr. 156:9–158:9, 190:18–192:13.) El Sehamy also testified that Hydro Tech had ruled out the possibility of an offsite source because, upon review of the Property's surrounding area, there were no dry cleaners in the vicinity of the site and the building next door was a restaurant. (Tr. 191:22–192:8.)

El Sehamy also testified that the Property is considered a "hazardous waste site," and contamination of groundwater required remediation. (Tr. 153:8–155:9.) He also testified that, of various methods of remediation, the vapor extraction and air sparging system method would be

the most convenient.[10]  (Tr. 197:15–198:5.)  Based on El Sehamy's experience having worked

on the remediation of several sites similar to the Property, he estimated that "it's going to cost

probably over $600,000" and will take between two and five years to remediate.  (Tr. 155:7–14.)

## III.  Conclusions of Law

Defendants and Plaintiff each assert breach of contract claims based on the Stipulation.

Plaintiff claims that she complied with the Stipulation and that Defendants breached multiple

provisions; Defendants claim that they performed in accordance with the Stipulation while

Plaintiff breached her obligations under the Stipulation.  Specifically, in *Tobin I*, Plaintiff claims

that Defendants breached: (1) paragraph 5 of the Stipulation, by failing to surrender the premises

"empty, broom clean, in good order, condition and repair, except for ordinary wear and tear;"

---

[10]  DeMartinis testified that there is an alternative remediation method which would be both effective and less expensive than the method proposed by El Sehamy.  As discussed above, the Court does not credit DeMartinis' testimony as to the appropriate method of remediation. First, as previously mentioned, DeMartinis' testimony was not based on any analysis or testing of the Property.  Second, DeMartinis' testimony was contradictory and was undermined by rebuttal testimony from El Sehamy.

DeMartinis testified that the best way to remediate the contamination at the Property would be to remove all of the soil in the Outdoor Space and monitor the groundwater at the Property for a one-year period during which time the contamination would decline due to "[d]ilution, dispersion, [and] biodegradation."  (Tr. 240:24–242:11, 246:13–23.)  He estimated that it would cost between $50,000 and $60,000 to dispose of the contaminated soil and between $18,000 and $20,000 to monitor the groundwater during the one-year period thereafter.  (Tr. 241:18–242:1, 242:12–20.)  While DeMartinis initially testified that it would be possible for the tetrachloroethene to break down to non-harmful byproducts via biodegradation, he subsequently testified on cross-examination that this would be the end result of a series of biodegradations and that the immediate byproducts would be contaminants.  (Tr. 246:16–247:13.)  El Sehamy testified in rebuttal to DeMartinis' testimony that tetrachloroethene does not biodegrade but rather breaks down to a series of byproducts all of which are more toxic than tetrachloroethene. (Tr. 270:20–271:3, 271:19–23.)  El Sehamy also testified that NYDEC would not permit Plaintiff to monitor the groundwater as proposed by DeMartinis because the Property is classified as a hazardous site and monitoring is not allowed in such cases.  (Tr. 270:11–19, 271:4–18.)  Finally, as to DeMartinis' testimony that it would cost $60,000 to dispose of the soil at the Property, El Sehamy testified that it is not possible to arrive at a credible estimate without first analyzing the soil because the cost of soil disposal depends on the level of contamination.  (Tr. 262:8–264:9.)

(2) paragraph 4 of the Stipulation, by failing to maintain and furnish proof of insurance coverage for the Property through and including August 2, 2007; and (3) paragraph 2 of the Stipulation, by moving to enforce the terms of the Stipulation and for an entry of judgment in the amount of $17,421.02 in the Civil Court of the City of New York, Kings County, on June 3, 2008. (*Tobin I* Second Am. Corrected Compl. ¶¶ 18, 20–23, 27; Pl. Post-Trial Br. 3–4, 7–9, 12.) In *Tobin II*, Defendants claim that Plaintiff breached the Stipulation by: (1) failing to refund the security deposit pursuant to paragraph 5 of the Stipulation; and (2) failing to execute a stipulation of discontinuance terminating *Tobin I* pursuant to paragraph 12 of the Stipulation. (*Tobin II* Compl., Docket Entry No. 1, ECF Nos. 10–11; Defs. Post-Trial Br. 15.)

"To state a claim for breach of contract under New York law, 'the complaint must allege: (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages.'" *Orlander v. Staples, Inc.*, --- F.3d ---, 2015 WL 5438783, at *3 (2d Cir. Sept. 16, 2015) (quoting *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011)); *see also Noise In the Attic Prods., Inc. v. London Records*, 782 N.Y.S.2d 1, 3 (App. Div. 2004). Here, the parties do not dispute the existence of a valid contract, the Stipulation. All other elements are disputed.

### a. Principles of contract interpretation under New York law

"When interpreting a contract [under New York law], the 'intention of the parties should control, and the best evidence of intent is the contract itself.'" *Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 313 (2d Cir. 2013); *see also Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir. 1985) ("As a general matter, the objective of contract interpretation is to give effect to the expressed intentions of the parties."). "At the outset, the court must determine whether the language the parties have chosen is ambiguous . . . ." *Gary*

*Friedrich Enters.*, 716 F.3d at 313 (quoting *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011)); *see also Alexander & Alexander Serv., Inc. v. These Certain Underwriters at Lloyd's, London, England*, 136 F.3d 82, 86 (2d Cir. 1998) ("Under New York law the initial interpretation of a contract is a matter of law for the court to decide," including "the threshold question of whether the terms of the contract are ambiguous." (internal quotation marks and citation omitted)).

A contract is unambiguous if its "language has a definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion." *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Trust Co., N.A.*, 773 F.3d 110, 114 (2d Cir. 2014) (quoting *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010)) (internal quotation marks omitted). Conversely, a contract is ambiguous where "a reasonably intelligent person viewing the contract objectively could interpret the language in more than one way." *Topps Co., Inc. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 69 (2d Cir. 2008). "[T]he language of a contract is not made ambiguous simply because the parties urge different interpretations," nor "does ambiguity exist where one party's view strains the contract language beyond its reasonable and ordinary meaning." *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 598 (2d Cir. 2005) (quoting *Seiden Assocs. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992)) (internal quotation marks and alterations omitted).

"If the contract is unambiguous, its meaning is . . . a question of law for the court to decide." *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009). "In interpreting an unambiguous contract, the court is to consider its [p]articular words not in isolation but in the light of the obligation as a whole and the intention of the parties as manifested thereby . . . but the court is not to consider any extrinsic evidence as to the parties' intentions." *Id.* (citations and

internal quotation marks omitted); *see also In re AMR Corp.*, 730 F.3d 88, 98 (2d Cir. 2013)

("[C]ourts applying New York law construe a contract 'so as to give full meaning and effect to

all of its provisions.'" (quoting *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996))).

By contrast, if the contract is ambiguous, "extrinsic evidence as to the parties' intent may

properly be considered." *JA Apparel*, 568 F.3d at 397. "Where there is such extrinsic evidence,

the meaning of the ambiguous contract is a question of fact for the factfinder." *Id.*

Stipulations are "subject to settled principles of contractual interpretation." *McCoy v.

Feinman*, 99 N.Y.2d 295, 302 (2002). The New York Court of Appeals has recognized that

"[s]tipulations not only provide litigants with predictability and assurance that courts will honor

their prior agreements but also promote judicial economy by narrowing the scope of issues for

trial." *Id.* (citations omitted). As such, "[s]tipulations of settlement are favored by the courts and

not lightly cast aside." *Hallock v. State*, 64 N.Y.2d 224, 230 (1984).

### b. Plaintiff's breach of contract claims

#### i. Plaintiff's breach claim based on paragraph 5 of the Stipulation

Plaintiff contends that Defendants breached their obligation under paragraph 5 of the

Stipulation to surrender the Property "empty, broom clean, in good order, condition and repair,

except for ordinary wear and tear." (Stipulation ¶ 5.) Plaintiff's claim is based on the various

defects allegedly observed or detected during the post-surrender inspections of the Property

performed by Tobin, Schmelkin and El Sehamy. Specifically, Plaintiff claims the Property was

not surrendered in the condition required under paragraph 5 given: the presence of

tetrachloroethene contamination in the subsoil and groundwater beneath the Building's basement

level, electrical wiring issues, the presence of trash and debris in the Outdoor Space, the presence

of standing water in the basement, the concrete columns erected in the basement, the condition of

the basement ceiling jousts, the condition of the ceiling-mounted heating unit, Defendants' failure to drain the pipes, the condition of the domestic plumbing system and fire sprinkler system, the condition of the Building's foundation walls, the condition of the Building's steel members, and the condition of the spalling sections of the Building's foundation walls.

The Court's assessment must begin with the relevant contract language and the threshold question of whether the language is unambiguous. *See Gary Friedrich Enters.*, 716 F.3d at 313. Paragraph 5 states, in relevant part: "[n]ot later than August 2, 2007 all respondents . . . shall surrender possession of the captioned premises to the petitioner, empty, broom clean, in good order, condition and repair, except for ordinary wear and tear." (Stipulation ¶ 5.) Because Plaintiff claims Defendants breached this provision due to a diverse array of defects alleged to have affected multiple parts of the Property, two threshold questions are presented. First, the Court must determine the scope of "captioned premises" as this term is used in paragraph 5 and, specifically, whether "captioned premises" refers only to the Building located on the Property or instead encompasses the entire parcel of land inclusive of the subsoil and groundwater beneath the Building. Second, the Court must determine the meaning of the clause "empty, broom clean, in good order, condition and repair, except for ordinary wear and tear" and whether the defects alleged are inconsistent with these requirements.

### 1.  Captioned premises

While paragraph 5 specifies the condition in which the "captioned premises" are to be surrendered, the Stipulation does not include definitions for any of the terms used therein, including the term "captioned premises." The caption at the top of the Stipulation's first page states, in relevant part, "Premises Address: 3480 Nostrand Avenue, Brooklyn, New York." (Stipulation 1.)

The meaning of "captioned premises" is deeply-contested by the parties. Although this issue has implications for a number of the defects that Plaintiff claims constituted a breach of the requirements under paragraph 5, the parties focused on the scope of "captioned premises" only with respect to the alleged contamination and the specific issue of whether "captioned premises" encompasses the subsoil and groundwater below the Building.[11]

Defendants contend that, pursuant to the unambiguous language of the Stipulation, "captioned premises" only refers to the interior of the Building because paragraph 5 requires, *inter alia*, that the "captioned premises" be surrendered in "broom clean" condition and this requirement only makes sense as to the interior of the Building because it is not possible to "broom clean" the parking lot or the unpaved soil located behind the Building. (Defs. SJ Mem. 5.) Defendants further contend that "reading paragraph 5 to require that the [e]ntire Property be returned 'broom clean' would impose a quixotic and draconian obligation on Defendants to 'broom clean' the [e]ntire Property, *including the front parking lot, the unpaved outdoor soil located behind the Building, and the soil underneath the Building*" such that the "captioned premises" must be construed to refer only to the interior of the Building to avoid this absurd and commercially unreasonable result. (*Id.*; *see also* Defs. Post-Trial Br. 3–4.) Defendants also argue that their assessment as to the meaning of "captioned premises" is supported by the New York Court of Appeals' decision in *South Road Associates, LLC v. International Business Machines Corp.*, 4 N.Y.3d 272 (2005), which Defendants claim is "directly on point." (Defs. SJ Mem. 4.) Defendants also assert that, because paragraph 7 of the Stipulation requires resolution

_____

[11] Despite the parties' singular focus on the meaning of "captioned premises" for purposes of Plaintiff's claim based on chemical contamination at the Property, if, for example, "captioned premises" is limited to the interior of the Building, Plaintiff's claim based on garbage and debris he left in the Outdoor Space would fail.

of a specific environmental problem pursuant to an order from the DEP, if paragraph 5 required them to surrender the entire Property free of environmental problems then paragraph 7 would be rendered superfluous.  (*Id.* at 7.)

Plaintiff contends that the meaning of "captioned premises" is unambiguous and refers to the entire lot — including the subsoil and groundwater beneath the Building — because the sole description or designation of the premises in the Stipulation's caption is "3480 Nostrand Avenue, Brooklyn, New York" which denotes the entire parcel at that address.  (Pl. SJ Opp'n 4; Pl. Opp'n to Defs. Post-Trial Br. 5–7.)  As to Defendants' argument based on the "broom clean" requirement, Plaintiff contends that "broom clean" should not be construed to limit "captioned premises" to the sub-portions of the larger lot capable of being swept and put in "broom clean" condition, but rather should be understood to impose the "broom clean" requirement as to the portions of the lot for which such a requirement makes sense.  (Pl. Opp'n to Defs. Post-Trial Br. 4.)

In response, Defendants contend that the language in the Stipulation's caption on which Plaintiff relies supports their interpretation of "captioned premises."  (Defs. Post-Trial Br. 4.) Defendants argue that "[i]f, as Tobin contends, the caption means to define the 'captioned premises' as the [e]ntire Property, the caption should simply state: 'Premises: 3480 Nostrand Avenue, Brooklyn, NY.'"  (*Id.*)  Defendants claim that, if the interpretation advanced by Plaintiff is accepted, the word "address" is rendered "superfluous and unnecessary."  (*Id.*)

Under New York law, a lease that conveys an entire building is automatically deemed to encompass the land on which the building stands unless the lease expressly states otherwise.  *See Doyle v. Lord*, 64 N.Y. 432, 436 (1876) ("If the plaintiffs had hired the whole building . . . their right to the yard could not have been questioned.  *The yard belonged to the building and was*

*appropriated to its use, and would pass under a lease of the building as a part of the premises demised.*" (emphasis added)); *see also* 1 Rasch's N.Y. Landlord & Tenant Incl. Summ. Proc. § 7:2 (4th ed.) ("A lease of an entire building, without further description, carries with it as part of the leased premises the land on which the building stands, as well as that part of the land in the same lot, not covered by the building, which adjoins it, and which has been appropriated to its use."); *Premises*, *Black's Law Dictionary* (10th ed. 2014) (defining "premises" as "[a] house or building, along with its grounds; esp., the buildings and land that a shop, restaurant, company, etc. uses").

However, as the particular contract language at issue is the ultimate governing factor in each case, where a lease expressly conveys only the interior of a building or a particular floor or sub-space within a building, the lease does not encompass the land beneath the building. *See Moy v. Young T. Lee & Son Realty Corp.*, 589 N.Y.S.2d 457, 458 (App. Div. 1992) (holding tenants could not be liable under lease for alleged defect of sidewalk adjacent to building of which tenants had leased only a portion; concluding lease did not encompass sidewalk because lease expressly defined "demised premises" as "an area shown in a floor plan incorporated in the lease as 'Exhibit A', which indicates portions of the first floor and the basement levels in red cross-hatching"); *see also Jane St. Holding, LLC v. Aspen Am. Ins. Co.*, No. 13-CV-2291, 2014 WL 28600, at *5 (S.D.N.Y. Jan. 2, 2014) (stating, in context of insurance coverage case and dispute as to scope of premises insured, "New York courts have held that if the description of the premises is not restricted to a particular office suite or floor, the policy covers the entire premises at the described location" (citing *Zohar Creations, Ltd. v. Those Certain Underwriters at Lloyd's*, 575 N.Y.S.2d 51, 52 (App. Div. 1991))), *aff'd*, 581 F. App'x 49 (2d Cir. 2014); *Zohar Creations, Ltd.*, 575 N.Y.S.2d at 52 ("If defendant intended to restrict the definition of

'premises' to the booth area, it was required to do so in clear and unambiguous language."); *cf.*
*Warner Bros. Pictures v. S. Tier Theatre Co.*, 109 N.Y.S.2d 781, 785 (App. Div. 1952) ("The
term 'premises' customarily is used to refer to the land or its appurtenances, but this is not
because the word itself is thus limited definitively but because it is usually the intention of the
parties that it have this direction of reference. Used in a context showing a wider intent, it may
have a meaning which will include personal property in an integral use with the land.").

The Stipulation here lists the address of the Property and does not specify any portion of
it thus it refers to the entire Building, and the default presumption under New York law — absent
specific language limiting the scope of the "premises" subject to the Stipulation — is that the
Stipulation encompasses the land on which the Building stands.

The New York Court of Appeals' decision in *South Road Associates*, on which
Defendants rely, is not to the contrary. The *South Road Associates* decision addressed the scope
of the term "premises" as contained in a lease provision which required "that the 'premises' be
returned in 'good order and condition.'" *S. Rd. Assocs., LLC v. Int'l Bus. Machs. Corp.*, 4
N.Y.3d 272, 276 (2005). There, under the lease, the defendant tenant leased two buildings from
the plaintiff who owned the site on which the buildings were located. *Id.* at 275. During its
occupancy, the defendant installed an underground storage tank at the site to hold chemical
waste. *Id.* at 276. The defendant subsequently discovered that the hazardous chemicals had
leaked out of the storage tank and contaminated the groundwater and soil at the site. *Id.* The
defendant "undertook an independent effort to clean up the site that included removal of the
underground storage tank and contaminated soil." *Id.* Despite the defendant's efforts to
remediate the contamination, after the termination of the lease, the plaintiff sued the defendant
claiming the defendant breached the lease provision requiring return of the "premises" in "good

order and condition." *Id.* at 276–77.

The court determined that "premises" encompassed only the interior portions of the buildings and not the land on which the buildings were situated. *Id.* at 277–78. The court's holding was based on the definition of "premises" under the lease as well as the court's reading of the lease as a whole. *Id.* at 278. First, the Court of Appeals noted that the lease defined "premises" as "the space shown on the 'floor plan' consisting of a certain number of square feet 'in two buildings.'" *Id.* The decision of the Appellate Division, which the Court of Appeals upheld, provides additional insight into the precise contract language. The Appellate Division noted that, "[t]he lease defined 'premises' as 'the space being more particularly shown on the attached floor plan' consisting of a certain number of gross square feet *in* buildings situated on 'land' . . . , which was in turn defined as the real property." *S. Rd. Assocs., LLC v. Int'l Bus. Machs. Corp.*, 770 N.Y.S.2d 126, 129 (App. Div. 2003). Second, the Court of Appeals concluded that the language of the lease as a whole supported its interpretation because "[t]he lease repeatedly mentions the 'premises' separately from the water tower, appurtenances, land, parking lot and building" and "the language in these provisions would be superfluous" if "premises" "was intended to include not only the interior space but also the buildings and the land surrounding the buildings." *S. Rd. Assocs.*, 4 N.Y.3d at 278; *see also S. Rd. Assocs.*, 770 N.Y.S.2d at 129 (noting that "[t]hroughout the lease, distinctions were made between the premises, the buildings, the land, and an adjacent parking facility").

Here, as distinct from the contract at issue in *South Road Associates*, the Stipulation does not include any language expressly limiting "captioned premises" to the interior of the Building or otherwise evincing a distinction between the Building and the surrounding land on the parcel outside of the Building. Moreover, New York Court of Appeals' precedent regarding the scope

of "premises" where a street address is the sole description of this term suggests that the use of an address denotes the entire parcel of land located at the given address.

The Court finds the New York Court of Appeals' decision in *Fortino v. State Liquor Authority*, 273 N.Y. 31 (1936), instructive. In *Fortino*, the Court of Appeals determined the meaning of "licensed premises" within the context of the Alcoholic Beverages Control Law, under which commercial establishments were required to obtain separate licenses to serve beer, liquor and wine and pursuant to which beer licensees were not permitted to keep or consume liquor or wine "on the licensed premises" without the appropriate license. *Fortino*, 273 N.Y. at 33, 35. At issue was the revocation of a beer license that had been issued to the plaintiff "for the sale of beer at retail for consumption in an eating place on the premises located at 8 Burgoyne [R]oad, Ticonderoga, New York." *Id.* at 33. The plaintiff's license was revoked after an investigator from the State Liquor Authority found wine hidden inside a dog house located behind the plaintiff's restaurant. *Id.* The Appellate Division determined that the "licensed premises" in this case was limited to the interior of the plaintiff's restaurant and did not encompass "places outside of the building and not connected with the building by direct access or by a common entrance" such that wine located in the free-standing dog house on the same parcel as the restaurant was not on the "licensed premises." *Id.* at 35. The Court of Appeals reversed the Appellate Division and held that "[w]here, as in this case, the premises are described only by street and number, it is plain that the licensed premises are the premises owned by the licensee at that address . . . . [both] indoors and out of doors . . . ." *Id.*

The Court is not persuaded by Defendants' argument that requiring them to return the Property in "broom clean" condition demonstrates that only the Building was meant to be the "captioned premises." Read as a whole, the more reasonable interpretation is that the string of

26

requirements — "empty, broom clean, in good order, condition and repair" — are to be met with respect to the entire parcel as applicable. Moreover, by the logic of Defendants' interpretation, because walls are not typically cleaned using a broom, "captioned premises" would not encompass the walls of the Building. However, Defendants do not dispute that the walls of the Building fall within "captioned premises." (Defs. SJ Mem. 10–11; Tr. of Dec. 16, 2014 Bench Trial & Oral Arg. ("Dec. 16, 2014 Tr.") 20:9–18 (arguing that the meaning of "captioned premises" should be informed by the meaning of "demised premises" as this term is used in the Lease, and asserting that Lease provisions regarding "interior portions" and "exterior side of the outside wall of the demised premises" only make sense if "demised premises" means "the interior of the building and the exterior walls of the building" and not the entire Property).)

Defendants' argument pursuant to paragraph 7 of the Stipulation — that because paragraph 7 requires the resolution of a particular order from the DEP, if paragraph 5 is read to require Defendants to surrender the entire Property free of environmental issues then paragraph 7 would be superfluous — is more plausible but ultimately not convincing. Paragraph 7 is expressly concerned with a particular order — annexed to the Stipulation as Exhibit B — that had already been received by Plaintiff, and was dated February 23, 2007, and mandated the "installation of an approved backflow prevention device in the water service pipe at the [Property] within thirty (30) days of the date of this Order." (Stipulation ¶ 7; *id.* at "Exhibit B.") Paragraph 5 of the Stipulation conditions return of the security deposit upon compliance with all obligations under the Stipulation "including . . . resolution of the environmental issues described in paragraph 7." (*Id.* ¶ 5.) The plain language of the Stipulation does not support a reading of paragraph 7 that limits the scope of "captioned premises."

The Court therefore finds that the language of the Stipulation is unambiguous and

"captioned premises" refers to the entire parcel and not merely the interior of the Building.[12] The Court now turns to the definition of "empty, broom clean, in good order, condition and repair."

### 2. Empty, broom clean, in good order, condition and repair

"The express obligation imposed by a lease to leave premises in good condition has long been interpreted to require the tenant not only to keep the premises in as good condition as when it enters, but *to put, keep, and leave the premises in a state of good repair*." *Akron Meats, Inc. v. 1418 Kitchens, Inc.*, 553 N.Y.S.2d 355, 357 (App. Div. 1990); Rasch, *supra* § 19:10 ("The tenant's obligation to leave the premises 'in good condition' has long been interpreted to require the tenant not only to keep the premises in as good condition as when it entered, but 'to put, keep, and leave the premises in a state of good repair.'" (citing *1029 Sixth, LLC v. Riniv Corp.*, 777 N.Y.S.2d 122 (App. Div. 2004))). The requirement to surrender the premises in "good order and condition" does not create an "obligation to remove properly authorized and properly constructed alterations and to restore the premises to the conditions originally existing at the commencement of the lease" but rather "require[s] only that a tenant repair and restore actual injury, physical damage, deterioration or waste of the premises caused by the tenant." *Civic Realty Co. v. N.Y. Tel. Co.*, 190 N.Y.S.2d 3, 6 (Sup. Ct. 1959).

The express obligation to surrender leased premises in "broom clean" condition has been interpreted to require that the premises be free of garbage, refuse, trash and other debris at the time of surrender. *1029 Sixth*, 777 N.Y.S.2d at 127; *Akron Meats*, 553 N.Y.S.2d at 357.

Two frequently cited New York State Supreme Court, Appellate Division cases are

---

[12]  Having determined that the language of the Stipulation is unambiguous, the Court declines to consider Defendants' arguments as to the meaning of "captioned premises" in light of extrinsic evidence such as the Lease. (Defs. SJ Mem. 8–11.)

instructive. In *Akron Meats*, the Appellate Division held that the condition of a commercial property that was "completely stripped" and "in a general state of disrepair" at the time of surrender gave rise to a breach of a provision in the lease at issue requiring the tenant to surrender the premises "broom clean, in good order and condition, ordinary wear and tear excepted, and tenant shall remove all its property." *Akron Meats*, 553 N.Y.S.2d at 356. The plaintiff, who had leased the storefront property from the defendant and operated it as a butcher shop, had installed various fixtures on the premises during its occupancy. *Id.* Upon termination of the lease, the plaintiff removed its heavy fixtures without repairing the resultant damage such that "sizeable holes remained in the floor where the refrigeration drain units had been located and wiring was left exposed." *Id.* After a bench trial, the lower court held that the condition of the premises as of surrender did not give rise to a breach because, given "the deteriorated condition in which the tenant had received the premises in this old building when it first took occupancy[,] . . . the tenant had complied with [the provision regarding the condition of the premises at surrender] by surrendering the premises in an essentially similar condition." *Id.* The Appellate Division reversed and rejected the lower court's assessment that "the tenant was only required to return the premises in the same condition as when they were received at the inception of the lease." *Id.* at 357. The court concluded that "[a]lthough plaintiff may have left the premises in no worse condition than when it first took occupancy, it clearly failed to fulfill the specific obligation . . . of the lease to leave the premises in 'good order and condition.'" *Id.*

Similarly, in *1029 Sixth*, the Appellate Division held that the commercial tenants who leased four stores from the same landlord breached the requirement under a stipulation to deliver the premises in "broom clean" condition when they left "garbage bags, refuse and shelving" on the premises. *1029 Sixth*, 777 N.Y.S.2d at 125–26. The tenants claimed the quantity of trash

and debris left behind was *de minimis* such that the difference between the condition in which they left the premises and a "broom clean" condition was negligible. *Id.* at 125. The court noted that, while the "exact quantities and qualities" of the trash and debris left at the premises was unknown, "the submissions of the respondent tenants . . . indicate that to complete the clean-up . . . the landlord would need to rent a dumpster and obtain the services of two laborers for approximately five or six hours" and it was, therefore, clear "that this circumstance involves far more than a trash bag or two needing to be brought to the curb." *Id.* at 126.

Having established the meaning of "captioned premises" and "empty, broom clean, in good order, condition and repair," the Court now addresses each of the ways Plaintiff has asserted that Defendants breached paragraph 5 of the Stipulation.

### 3. Groundwater contamination

Plaintiff contends that Defendants breached the obligation to surrender the Property in "good order, condition and repair, except for ordinary wear and tear" due to the contamination of the subsoil and groundwater below the basement.

As noted above, the parties' focused almost exclusively on the scope of "captioned premises" as determinative of whether Defendants could be liable for the contamination under the Stipulation. Having determined that "captioned premises" is not limited to the interior of the Building, and encompasses the parcel on which the Building stands, the Court addresses whether the presence of subsoil and groundwater contamination constitutes a breach of the covenant to surrender the Property in "good order, condition and repair."[13]

---

[13] Likely as a result of Defendants' singular focus on the scope of "captioned premises" as the basis for their summary judgment motion as to the contamination claim, Plaintiff made few affirmative arguments on the issue of whether the covenant to surrender the Property in "good order, condition and repair" obligated Defendants to remediate the contamination taking

## A. "[G]ood order, condition and repair"

The Court first considers whether the contamination of subsoil and groundwater with a hazardous chemical constitutes a condition that is inconsistent with "good order, condition and repair."

The Oxford English Dictionary definition of the adjective "good" is "[t]o be desired or approved of." *Good*, *Oxford Dictionaries*, http://www.oxforddictionaries.com/ (last visited Sept. 29, 2015). The noun "order" is defined as "[t]he overall state or condition of something." *Id.* at *Order.* The noun "condition" is defined as: "[t]he state of something, especially with regard to its appearance, quality, or working order." *Id.* at *Condition.* The noun "repair" is defined as "[t]he relative physical condition of an object." The verb "repair" is defined as "[f]ix or mend (a thing suffering from damage or a fault)" and "[m]ake good (such damage) by fixing or repairing it." *Id.* at *Repair.* Black's Law Dictionary defines the verb "repair" as, "[t]o restore to a sound or good condition after decay, waste, injury, partial destruction, dilapidation, etc." *Repair*, *Black's Law Dictionary*; *see also In re Caldor, Inc.-NY*, 204 B.R. 855, 859–60 (Bankr. S.D.N.Y. 1997) ("[T]o repair implies that a certain item has reached a state where it has been damaged and needs to be returned to its original condition, or at least be returned to an undamaged state.").

---

into account the language in paragraph 5 and the Stipulation as a whole. In fact, Plaintiff's counsel appears to have been under the impression that there was no dispute between the parties as to whether the Stipulation provided for liability due to contamination apart from the dispute regarding the meaning of "captioned premises." During oral argument on Defendants' motion for summary judgment, Plaintiff's counsel asserted, "[g]ood condition means obviously without pollution, but I don't need to argue that. I think we are conceded that pollution means not good condition." (Dec. 16, 2014 Tr. 12:11–13.) Defendants' submissions to the Court do, in places, seem to concede that "good order, condition and repair" encompassed contamination so long as it was within the Building. For example, Defendants assert "it is submitted that the Stipulation did not make [Defendants] liable for any environmental contamination except that which existed in the [B]uilding itself," (Defs. SJ Mem. 4), and "even if this Court reads paragraph 5 of the Stipulation to refer to the [e]ntire Property, Tobin's recovery for the [e]nvironmental [c]laim must be limited to the cost of remediation," (Defs. Opp'n to Pl. Post-Trial Br. 10).

Assigning these terms their ordinary meaning, a state of "good order, condition and repair" is inconsistent with contamination by a hazardous chemical. *See Civic Realty Co.*, 190 N.Y.S.2d at 6 (covenant "to surrender the premises in 'good order and condition'" requires "that a tenant repair and restore actual injury, physical damage, deterioration or waste of the premises caused by the tenant"); *Chem. Bank v. Stahl*, 712 N.Y.S.2d 452, 464 (App. Div. 2000) (reversing grant of summary judgment in favor of tenant on landlord's claim pursuant to commercial lease alleging, *inter alia*, tenant breached covenant to "quit and surrender the demised premises to Landlord in good order, condition and repair, except for ordinary wear and tear" because tenant failed to remove hazardous fireproofing installed prior to tenant's occupation of premises but modified by tenant while in possession which was a fact issue).

Here, as Plaintiff has established that the groundwater at the Property is contaminated with a hazardous chemical, Plaintiff has established a breach of the covenant to surrender the Property in "good order, condition and repair."

### 4. Electrical wiring issues

Plaintiff contends that Defendants breached paragraph 5 of the Stipulation because Tobin observed what he deemed to be "all kinds of illegal electrical wiring" during his post-surrender inspection of the Property. (Tr. 31:12–14.) Tobin's basis for his testimony that the electrical wiring was illegal was that he "know[s] you don't run wires loose throughout the walls" or "nail electrical boxes to the outside of the walls." (Tr. 33:24–34:7.) Schmelkin's 2007 report concluded that, "[w]here visible, the general condition of the wiring and fixtures is fair to poor" and "[t]he electrical system is in need of repair and further investigation." (Ex. G at 12, 19.) Schmelkin's 2007 report also noted that "extensive electrical changes have been made to the [B]uilding" and "[m]any sub-panels and circuit breakers and disconnect switches have been

added." (Ex. G at 12.) Schmelkin did not provide any testimony as to whether these additions were illegal or whether the "fair to poor" condition of the wiring was due to ordinary wear and tear.

While the evidence presented suggests some degree of disrepair, Plaintiff did not present sufficient evidence as to the condition of the wiring upon surrender and the extent to which any defects or disrepair were attributable to defects other than ordinary wear and tear. The Court can only speculate, for example, as to whether some or all of the unspecified "electrical changes" noted in Schmelkin's 2007 report are inconsistent with the requirements under paragraph 5 of the Stipulation. Plaintiff has therefore failed to establish a breach of paragraph 5 of the Stipulation based on the condition of the Property's electrical system and wiring upon surrender.

### 5. Sidewalk and exterior foundation

Plaintiff contends that Defendants breached paragraph 5 of the Stipulation by failing to repair the sidewalk at the Property. Although Tobin testified that the sidewalk was "broken" at the time of his post-surrender inspection, and that Plaintiff received a violation from the City requiring her to "repair a broken sidewalk," (Tr. 34:18–22), Plaintiff did not present any further evidence regarding the condition of the sidewalk — as of surrender or at any other point — and, as a result, the Court lacks sufficient evidence as to the nature and extent of the defect Tobin observed and whether it was attributable to ordinary wear and tear.[14] Plaintiff also failed to present evidence as to the date or substance of the violation Plaintiff received from the City, and

---

[14] Though Schmelkin's 2007 report notes that "[t]he driveway, alleyway and sidewalks are in need of repairs and rehabilitation at this time," the report provides no further information as to the sidewalks' condition, the nature of the "repairs and rehabilitation" recommended, and the extent to which the sidewalks' condition was attributable to ordinary wear and tear. (Ex. G at 18.)

Tobin's testimony did not affirmatively establish that the violation was issued in response to the "broken" condition of the sidewalk as of surrender.[15] (Tr. 34:18–22.) Accordingly, Plaintiff failed to establish a breach of the Stipulation based on Tobin's testimony that the sidewalk was "broken" at the time of his post-surrender inspection.

Similarly, Plaintiff has failed to establish a breach of paragraph 5 of the Stipulation based on Tobin's testimony that he observed "large trees" "growing out of the foundation of the [B]uilding" during his inspection of the Building's exterior. (Tr. 34:22–25.) While the presence of trees growing out of, or in close proximity to, the Building's foundation suggests some degree of disrepair and a condition that, depending on the precise facts, might plausibly result in structural damage to the Building or its foundation, Plaintiff provided insufficient evidence for the Court to reach such a conclusion.[16] Without more evidence as to the condition of the exterior foundation and the tree growth Tobin noted, such as quantitative evidence as to the size or number of the trees or the extent of overlap between the tree growth and the foundation, the Court can only speculate as to the condition of the Building's exterior foundation upon surrender, the extent of the tree growth Tobin observed, and the likely cause of such tree growth.

---

[15] Tobin also testified that, "since surrender," he has paid "fines for the sidewalk not being clean" in response to "at least ten citations" imposing fines of $100 each. (Tr. 50:25–51:25.) There was no additional evidence as to the circumstances of these fines, when they were issued or paid, or why they would be attributable to Defendants.

[16] Schmelkin testified that he began his August 9, 2007 inspection by inspecting the grounds around the exterior of the Building and concluded that "the grounds were below average neglected condition as looking at it from the exterior." (Tr. 105:11–13.) Schmelkin's 2007 report also states that, "the trees which are in direct contact with the building at the left side" should be removed, as they "can do damage to the foundation and frame." (Ex. G at 6.) Even crediting this testimony, Plaintiff fails to prove a breach of paragraph 5. Plaintiff has also failed to prove any damages due to tree growth from the Building's foundation.

### 6. Trash and equipment in backyard

Plaintiff also claims Defendants breached paragraph 5 of the Stipulation by leaving trash and debris in the Property's backyard. Tobin testified that he observed "dumped equipment from a dry cleaner, concrete [and] all kinds of trash" in the backyard area of the Property. (Tr. 34:25–35:2.) Although no additional evidence was presented regarding the quantity or specific nature of the trash and debris, Defendants did not challenge Tobin's testimony during cross-examination or present any evidence as to the condition of the backyard at the time of surrender of the Property to contradict or undermine this testimony. In addition, Schmelkin's 2007 report corroborates Tobin's testimony as it states, "[a]ll debris must be removed from the rear yard." (Ex. G at 8.) Therefore, the Court credits Tobin's testimony as to the presence of trash, discarded equipment and concrete in the backyard at the time of surrender. The presence of such trash and debris during Tobin's post-surrender inspection of the Property constitutes a breach of Defendants' obligation to surrender the premises "empty, broom clean, in good order, condition and repair." *See 1029 Sixth*, 777 N.Y.S.2d at 126 (finding tenant's failure to remove "garbage bags, refuse and shelving" breached requirement under a stipulation to deliver the premises in "broom clean" condition because although "exact quantities and qualities" of the trash and debris were unknown, the circumstances clearly involved "more than a trash bag or two needing to be brought to the curb").

### 7. Standing water in basement

Plaintiff claims that Defendants breached paragraph 5 of the Stipulation by leaving standing water on the basement floor. In addition to Tobin's testimony that "there was probably six or seven inches of standing water on the floor" in the basement at the time of his inspection, (Tr. 46:14–22), Schmelkin's 2007 report notes that the basement "was partially flooded at the

time of [Schmelkin's] inspection," (Ex. G at 6). Defendants did not contradict or address the evidence presented by Plaintiff as to the standing water and the Court therefore credits Tobin's testimony and Schmelkin's 2007 report as to the presence of between six and seven inches of standing water in the basement as of surrender. Because standing water is inconsistent with the "good order, condition and repair" requirement under the Stipulation, and because there is no evidence that such standing water was caused by "ordinary wear and tear," the evidence was sufficient to establish that Defendants' failure to remediate the standing water in the basement constituted a breach of paragraph 5.

### 8.    Concrete columns in basement and rusted steel supports

Plaintiff also claims Defendants breached paragraph 5 of the Stipulation by leaving concrete columns in the basement of the Building upon surrender of the Property. Tobin and Schmelkin's testimony was sufficient to establish that concrete columns were present in the basement upon surrender and to establish that these columns were not present when Defendants took occupancy — based on which the Court can infer that the columns were erected by Defendants in connection with their use of the Property. (Tr. 106:5–15.) However, the evidence did not establish that Defendants' failure to remove the columns constituted a breach of paragraph 5 (or any other provision) of the Stipulation. The evidence suggests that the columns may constitute "improvements" or "fixtures," but the Stipulation does not expressly mention or otherwise reference fixtures or alterations. While leases commonly include provisions setting forth particular requirements applicable to fixtures or improvements upon surrender — for example, a provision that requires the tenant to remove all improvements prior to surrender, or by contrast, a provision that makes all improvements by the tenant the landlord's property and prohibits removal upon surrender — the Stipulation does not include such a provision. Under the unambiguous language of the Stipulation, the failure to remove fixtures, alterations or

improvements only gives rise to a breach if the presence of such alterations contravenes the requirement that the Property be "empty, broom clean, in good order, condition and repair." (Stipulation ¶ 5.) There is no evidence to suggest the columns were unsafe or contrary to the good order of the Property. In fact, the evidence suggests that *removal* of the columns may have created an unsafe condition given their status as an "auxiliary" structure. (Tr. 140:23–25); *see In re Water Front on N. River in City of N.Y.*, 192 N.Y. 295, 302 (1908) ("The familiar limitation upon the right to remove such fixtures is that the removal must be accomplished without substantial injury to the freehold.").

Plaintiff also failed to establish a breach of paragraph 5 of the Stipulation based on Plaintiff's allegations of rust to the steel columns. Schmelkin's 2012 report set forth his assessment that steel supports — ostensibly related or connected to the columns in some manner given Schmelkin's submission of a single cost estimate pertaining to both the columns and the steel supports — were "badly rusted." (Ex. H at 4.) Schmelkin testified, however, that the "badly rusted" steel supports noted in his 2012 Report are not mentioned in his 2007 report. (Tr. 125:13–126:1.) As such, there is no evidence as to the condition of the steel supports at the time of surrender of the Property in 2007 and there is no evidence that the rust was not due to ordinary wear and tear.

### 9. Basement ceiling jousts

Plaintiff failed to substantiate a breach of paragraph 5 of the Stipulation based on the condition of the basement ceiling jousts as described in Schmelkin's 2012 report because there is no testimony about the condition of the basement ceiling jousts in 2007 and they were not mentioned in Schmelkin's 2007 report. (Tr. 128:10–18.) Moreover, Schmelkin testified that he did not notice the condition of the basement ceiling jousts during his 2007 inspection.

(Tr. 115:6–15.)  Thus, the Court has no competent evidence as to the condition of the ceiling jousts at the time of the surrender of the Property.

### 10. Removal of heating unit and failure to drain pipes prior to surrender

Plaintiff also claims that the Property was not surrendered "in good order, condition and repair" because Defendants failed to drain the water pipes prior to vacating the Property and because they removed one of the heating units attached to the ceiling of the Building's first floor.

Neither the terms of the Stipulation nor the evidence presented during the trial support Plaintiff's claim that Defendants were required to drain the pipes in order to satisfy their obligation to surrender the Property in accordance with paragraph 5.  Paragraph 5, however, expressly mandates surrender of the premises "[n]ot later than August 2, 2007."  (Stipulation ¶ 5.)  Based on the ordinary meaning of "good order, condition and repair," and with no other provision in the Stipulation imposing this requirement, the Court has no basis to conclude that the requirement to surrender the Property in such a condition in August encompasses the obligation to drain the Building's pipes.  As Tobin's testimony demonstrates, freezing temperatures trigger the potential for property damage due to frozen pipes.[17]  Moreover, paragraph 5 expressly provides for the inspection of the Property immediately after surrender by professionals "including plumbers" and draining the pipes would, presumably, have the potential to impede such inspections.  (Stipulation ¶ 5.)  There is no evidence to support Plaintiff's claim that Defendants breached the Stipulation by failing to drain the pipes prior to surrender.

---

[17]  For example, during cross-examination, Tobin testified that he was certain that the flood did not happen in August of 2007 because, "I don't think the weather was cold enough in August 2007 to freeze the water."  (Tr. 53:2–4.)  Tobin also testified that, at the time he conducted his post-surrender inspection, he understood that if the pipes were not drained and the heat was not turned on there was a danger that the pipes could burst and cause a flood stating, "I think that's pretty common knowledge."  (Tr. 54:7–10.)

However, the evidence was sufficient to establish a breach based on the removal of one heating unit, which Schmelkin described as a "ceiling-hung gas-fired furnace," from the ceiling of the first-floor level of the Building.  (Ex. G at 9.)  The testimony of Tobin and Schmelkin established that, at the time of their respective inspections in 2007, one ceiling-mounted heating unit had been removed and, as a result, pipes that were previously connected to the unit were disconnected.  Schmelkin's 2007 report also corroborates this testimony.  (*Id.*)  Defendants did not rebut this testimony and this evidence is sufficient to establish a breach of Defendants' obligation to surrender the premises in good order and condition.  *See Akron Meats*, 553 N.Y.S.2d at 357 (holding tenant breached obligation to surrender premises "in good order and condition" due to tenant's failure to repair damage caused by removal of fixtures, failure to repair was breach of covenant regardless of condition of premises when tenant took occupancy); Rasch, *supra* § 16:5 ("In all cases where a tenant has the right to, and does, remove domestic or trade fixtures, he must do so with as little injury as possible to the freehold.  Where the injury done is more than insignificant, he must repair and restore the freehold to its original condition.").

### 11.   Condition of domestic plumbing and fire sprinkler systems

Plaintiff did not establish a breach of paragraph 5 of the Stipulation based on the alleged defects to the domestic plumbing and fire sprinkler systems as described in the Schmelkin's 2012 report.  There is no testimony from Tobin regarding the condition of the plumbing or fire sprinkler systems at the time of surrender, and Schmelkin testified that the plumbing system was "functional" at the time of his initial inspection.  (Tr. 117:10–23.)  In addition, Schmelkin's 2007 report describes the plumbing system as "operational, but aging and neglected," (Ex. G at 19), and does not mention the fire sprinkler system, (Tr. 129:10–14).  As there is no competent evidence as to the condition of the domestic plumbing or fire sprinkler systems at the time when

Defendants surrendered the Property, Plaintiff did not establish a breach based on the condition of the domestic plumbing system or the fire sprinkler system.

## 12. Cracks to foundation walls

Plaintiff also failed to establish a breach of paragraph 5 of the Stipulation based on cracks in the foundation walls of the Building. Schmelkin's 2007 report indicates that there were cracks in the foundation walls on both the inside and outside of the Building at the time of surrender. (Ex. G at 6.) The evidence presented was not, however, sufficient to show that cracks to the foundation walls that were present at the time of surrender were: (1) not attributable to ordinary wear and tear, and (2) attributable to a condition constituting a breach of the covenants under paragraph 5 of the Stipulation. Although cracks in the foundation walls were noted in Schmelkin's 2007 and 2012 reports, both reports state "[t]his condition is not serious and can be readily corrected by a good handyman. It should be noted that many foundation walls do develop cracks. Further, the degree of cracking in these premises does not indicate a major structur[al] defect." (Ex. G at 6; Ex. H at 3.) Both reports also note that the structural conditions reported, including the foundation wall cracks, are due to "settlement and movement . . . very common in structures of this age group." (Ex. G at 6; Ex. H at 3.)

At trial Schmelkin testified that the foundation wall cracks were attributable to either ordinary wear and tear or moisture leakage that was not due to ordinary wear and tear. (Tr. 131:10–132:5.) However, there was insufficient evidence as to the source or nature of the moisture leakage that could have given rise to the cracks to support the conclusion that the cracks constituted a breach of the obligation to surrender the Property in "good order, condition and

repair."[18]  Although Schmelkin testified about photographs of the Property which were admitted as exhibits by Plaintiff, and Schmelkin identified cracks that were not due to ordinary wear and tear, (Tr. 132:18–137:12), it was never established whether these photographs were taken during Schmelkin's 2007 inspection of the Property or at some other time in close proximity to the date of surrender.[19]  The evidence presented regarding the foundation wall cracks was, overall, not sufficient to substantiate a breach of the Stipulation based on the condition of the foundation walls.

### 13. Rust to steel members

The evidence presented was also insufficient to substantiate a breach of paragraph 5 of the Stipulation based on the condition of the steel members.  Although both Schmelkin's 2007 and 2012 reports recommended "[s]craping and painting of all the steel members," (Ex. G at 6; Ex. H at 3), and Schmelkin testified that the condition of the steel members was not due to ordinary wear and tear but rather water leakage, (Tr. 139:1–10), there was no further evidence as to the cause or extent of the water leakage.  The evidence was therefore insufficient to establish

---

[18]  It was not clear to the Court, for example, that the moisture leakage alleged to have caused the foundation wall cracks was not, at least in part, related to the alleged post-surrender flood which, as is explained below, is irrelevant as to the sufficiency of Defendants' performance under paragraph 5 of the Stipulation and cannot form the basis for any damages in these actions.

[19]  The record establishes that Schmelkin took the photographs of the Property admitted as Plaintiff's Exhibits E-1 through E-8, (Tr. 123:8–14), and Tobin testified that the photographs fairly represented the Property's condition at the time of surrender, (Tr. 39:15–25).  However there was no testimony as to when Schmelkin took the photographs and the photographs are undated.  While it is clear from Schmelkin's 2007 report that he took photographs during his 2007 inspection, as the report includes citations to photographs (which were not appended to the report or included as part of Exhibit G), the 2007 report does not include any references or cites to photographs that are clearly identifiable as those admitted as Plaintiff Exhibits E-1 through E-8.  Moreover, Schmelkin's 2012 report also references photographs and indicates that the report is "supplemented by nine photos" which were ostensibly taken during Schmelkin's 2012 inspection.  (Ex. H at 4.)

that the condition of the steel members constituted a breach of the requirements under paragraph 5 of the Stipulation.

### 14.   Spalling section of foundation walls

The evidence presented was also insufficient to substantiate a breach of the covenants under paragraph 5 of the Stipulation based on the condition of the spalling section of the foundation walls upon surrender.  Schmelkin testified that he did not know to what extent the spalling section's condition was due to ordinary wear and tear, (Tr. 138:15–20), and the Court therefore has no basis to determine what, if any, portion of the alleged damage could be a breach of paragraph 5 of the Stipulation which expressly excepts "ordinary wear and tear," (Stipulation ¶ 5).

Thus, Plaintiff has established that Defendants breached paragraph 5 of the Stipulation based on the tetrachloroethene contamination of the groundwater at the Property; the presence of trash and discarded equipment in the Outdoor Space; the presence of standing water in the basement; and the severed and disconnected gas pipes caused by the removal of a ceiling-mounted heating unit in the Building.

### ii.   Plaintiff's breach claim based on paragraph 4 of the Stipulation

In addition to paragraph 5 of the Stipulation, Plaintiff contends that Defendants breached paragraph 4 of the Stipulation by failing to maintain and furnish proof of insurance coverage for the Property for the period through and including August 2, 2007.  (*Tobin I* Second Am. Corrected Compl. ¶¶ 18(b), 27(b).)  Defendants moved for summary judgment as to Plaintiff's claim pursuant to paragraph 4 of the Stipulation arguing that the obligation to maintain insurance under paragraph 4 is that of the corporate entity Beaaro, not Defendants.  (Defs. SJ Mem. 12.) Defendants assert that, under the Stipulation, some obligations are only assigned to specific

parties such that only the specified parties may be liable for the failure to discharge the obligations. (*Id.*) Defendants argue that, because paragraph 4 is such a provision and Beaaro is not a party, Plaintiff's claim for breach of paragraph 4 must be rejected.[20] (*Id.*)

"It is possible in the same contract that some promises shall be joint and others by the same promisors shall be several." *In re John B. Rose Co.*, 275 F. 409, 414 (2d Cir. 1921); *see also Wujin Nanxiashu Secant Factory v. Ti-Well Int'l Corp.*, 802 N.Y.S.2d 411, 414 (App. Div. 2005) ("Settled rules governing the interpretation of contracts provide that when two or more entities take on an obligation . . . they do so jointly, and that words of severance are necessary to overcome this primary presumption."). "Under New York law, in the case of a contract with multiple obligors or multiple obligees, whether contract rights or duties are joint, several, or joint and several is ultimately a question of the parties' intent, as revealed by the language of their contract and the subject matter to which it relates, as well as the surrounding circumstances." *Klauber Bros. v. Russell-Newman, Inc.*, No. 11-CV-4985, 2013 WL 1245456, at *3 (S.D.N.Y. Mar. 26, 2013) (citations, quotation marks and alterations omitted), *aff'd sub nom. Klauber Bros. v. Bon-Ton Stores, Inc.*, 557 F. App'x 77 (2d Cir. 2014). Where a contract among multiple parties specifically assigns certain obligations to particular parties and expressly makes only those parties responsible for nonperformance, breach of contract claims pursuant to such provisions may only be asserted against the particular party to whom the obligation was

---

[20] Plaintiff's opposition in response to Defendants' motion for summary judgment does not respond to these arguments or otherwise address the viability of Plaintiff's claim pursuant to paragraph 4. Defendants' post-trial brief also asserts that the requirement to maintain insurance under paragraph 4 is that of Beaaro only, (Defs. Post-Trial Br. 12), and Plaintiff again fails to address this point in either her opposition to Defendants' post-trial brief or in Plaintiff's own post-trial brief. Plaintiff does not, however, appear to have abandoned her claim under paragraph 4 because Plaintiff's post-trial brief includes multiple references to Defendants' failure to obtain insurance as required under paragraph 4. (Pl. Post-Trial Br. 4, 7, 12.)

assigned. *See Klauber Bros.*, 2013 WL 1245456 at *3–4 (dismissing breach of contract claim based on settlement agreement where plaintiff brought claim pursuant to provision that assigned obligation thereunder to particular signatory not named in plaintiff's suit); *Pavon v. 19th St. Assocs. LLC*, No. 112027/02, 2007 WL 3314014, at *4–5, 11 (N.Y. Sup. Ct. Nov. 8, 2007) (dismissing claims for breach of provision in commercial lease requiring corporate entity lessee to procure insurance where claims were asserted against an individual and a corporate entity other than lessee because "[t]he promise to procure insurance . . . was made only by Kaltech Industries Group, Inc., the lessee under the [l]ease").

Here, paragraph 4 of the Stipulation states:

> Beaaro shall maintain insurance on the subject property as required by the lease, to and including August 2, 2007. Respondent shall provide Tobin's attorneys with proof of payment of said insurance not later than July 16. 2007. A letter of reinstatement or continuity without lapse of the applicable premiums for the applicable period shall constitute the proof required under this paragraph. The coverage shall comply with the requirements set forth in Exhibit A hereof.

(Stipulation ¶ 4.) Like paragraph 4, paragraphs 3 and 6 each ascribe particular obligations to the corporate entity Beaaro. (Stipulation ¶ 3 (providing that "Beaaro . . . shall reimburse petitioner" for specified portions of payments for real estate taxes, water and sewer bills, and state and local impositions, fees and violations); *id*. at ¶ 6 (providing that "Beaaro shall pay to the petitioner, by certified funds or cashier's check, the sum of $250,000").) While paragraphs 3, 4 and 6 are similar in that they each require Beaaro — as opposed to all respondents under the Stipulation — to make particular payments, paragraph 8 of the Stipulation expressly provides for joint and several liability in the event of Beaaro's failure to make the payments specified under paragraphs 3 and 6, but there is no corresponding provision that provides for the same with

respect to paragraph 4.[21]  In contrast to paragraph 8, paragraph 1 of the Stipulation specifies that a warrant of eviction "may be executed prior to [August 2, 2007] if any of the terms and conditions of paragraphs 3 or 4 are not timely complied with . . . ."  (*Id.* at ¶ 1.)

Therefore, while the Stipulation expressly provides for joint and several liability in the event of Beaaro's failure to make timely payments pursuant to paragraphs 3 and 6, it includes no similar provision with respect to the insurance coverage obligation under paragraph 4, and instead provides only for early execution of a warrant of eviction should Beaaro fail to timely comply with paragraph 4.  Given the foregoing, the plain language of the Stipulation does not provide for the liability of, or the entry of judgment against, either Defendants in the event of Beaaro's failure to maintain insurance as required by paragraph 4 of the Stipulation.[22]

---

[21]  Paragraph 8 of the Stipulation states, in relevant part:

> In the event that the respondents shall fail to comply with any of the provisions and terms of paragraphs "3" or "6" above, the petitioner, through her attorneys may immediately enter judgment pursuant to CPLR 3215(i), as follows (in addition to causing the warrant of eviction to be executed immediately):
>
> (a) for Beaaro's failure to timely and fully comply with any of subparagraphs 3(a), 3(b) or 3(c), judgment against Beaaro, Ivan Gluck, Phyllis Gluck, Kenneth Gluck and Daniel Gluck, jointly and severally, in the amount which would be payable under the respective paragraphs, together with all reasonable attorneys' fees and costs incurred by petitioner to obtain and enforce such judgment.
>
> (b) for Beaaro's failure to timely and fully comply with paragraph 6, judgment in the amount of $350,000, together with all reasonable attorneys' fees and costs incurred by petitioner to obtain and enforce such judgment less any payments made against the obligations of paragraph 6 by respondents.

(Stipulation ¶ 8.)

[22]  The Court's conclusion as to the scope of liability under paragraph 4 is not affected by the fact that paragraph 4 provides that the insurance "coverage shall comply with the requirements set forth in Exhibit A hereof," and Exhibit A of the Stipulation, in turn, provides that "[r]espondents shall maintain" insurance coverage as described therein.  (Stipulation ¶ 4; *id.*

Accordingly, Plaintiff has not established that Defendants breached paragraph 4 of the Stipulation because the obligation to maintain insurance is not that of Defendants.[23]

### iii. Plaintiff's breach claim based on paragraph 2 of the Stipulation

Plaintiff also claims that Defendants breached paragraph 2 of the Stipulation by moving to enforce the terms of the Stipulation and seeking an entry of judgment in the amount of $17,421.02 (the stipulated amount of the security deposit) in the Civil Court of the City of New York, Kings County on June 3, 2008 (the "L&T Application"). (*Tobin I* Compl. ¶¶ 20, 27(a)); *see also Tobin*, 11 F. Supp. 3d at 286. Specifically, Plaintiff alleges that Defendants either made the L&T Application or induced Beaaro to do so. (*Tobin I* Compl. ¶ 27(a).) By decision dated January 23, 2009, the Civil Court granted the L&T Application in its entirety (the "L&T Decision"). *See Tobin*, 11 F. Supp. 3d at 286. By decision dated March 17, 2011, the Appellate Term reversed the L&T Decision on the grounds that the civil court lacked jurisdiction to grant the entirety of the relief requested. *Id.*

Paragraph 2 of the Stipulation states:

> Respondents, and each of their principals, agents, officers, employees, shareholders and all persons claiming under them stipulate and agree that they shall not make or file any application or any request or motion, <u>for any reason</u> in this or any other Court, tribunal or enforcement officer or entity, for a stay, modification or forbearance of enforcement of any term or condition of this Stipulation, including, without limiting the generality of the foregoing, the execution of the warrant of eviction.

at "Exhibit A.") Although Exhibit A of the Stipulation refers to the maintenance of insurance coverage by "respondents," as opposed to Beaaro as specified in paragraph 4, paragraph 4 of the Stipulation only incorporates Exhibit A for the express purpose of setting forth the particular terms and requisite scope of the insurance coverage to be maintained. Exhibit A, therefore, does not alter the express language of paragraph 4 which assigns the obligation to maintain insurance coverage to Beaaro.

[23] Having resolved Plaintiff's claim pursuant to paragraph 4 of the Stipulation on the merits, the Court denies Defendants' motion for summary judgment as to this claim as moot.

(Stipulation ¶ 2.) Plaintiff did not present any evidence during the trial regarding the L&T Application, the L&T Decision, or any other aspect of her breach of contract claim pursuant to paragraph 2 of the Stipulation. Plaintiff's post-trial brief similarly fails to address her claim pursuant to paragraph 2 and the L&T Application. Thus, Plaintiff appears to have abandoned her claim pursuant to paragraph 2 of the Stipulation. However, because Defendants argue in their pending summary judgment motion that they are not in violation of paragraph 2 of the Stipulation, the Court will nevertheless resolve Plaintiff's breach of contract claim.[24] Though Defendants' pending motion for summary judgment seeks dismissal of, *inter alia*, Plaintiff's claim based on the L&T Application, (Defs. SJ Mem. 11–12), Plaintiff's opposition does not respond to Defendants' arguments or otherwise address the viability of Plaintiff's claim pursuant to paragraph 2 of the Stipulation. Defendants assert that the Stipulation neither prohibits them from moving to enforce the Stipulation by applying for a judgment against Plaintiff nor does it preclude them from inducing Beaaro to do the same. (*Id.* at 11.)

Based on the plain language of paragraph 2 of the Stipulation and in light of the relief Defendants sought pursuant to the L&T Application, the L&T Application by Defendants did not constitute a breach of paragraph 2 of the Stipulation. Paragraph 2 of the Stipulation specifically precludes, "any application or any request or motion . . . for a stay, modification or forbearance of enforcement of any term or condition of this Stipulation." (Stipulation ¶ 2.) Under the New York Civil Practice Law and Rules ("CPLR") a motion to stay proceedings represents a request to halt and suspend a case. *See* N.Y. C.P.L.R. § 2201. The CPLR also allows parties to move

---

[24] Because no facts were presented by Plaintiff in support of this claim, the foregoing facts regarding the L&T Application and L&T Decision are drawn from the Court's March 28, 2014 Memorandum and Order, whereby the Court resolved Defendants' then-pending motion for summary judgment in *Tobin I*, Plaintiff's cross-motions for summary judgment in *Tobin II* and Plaintiff's application to further amend the amended complaint in *Tobin I*.

for a protective order or modification in response to a judgment creditor's invocation of the various enforcement devices under the CPLR. *See* N.Y. C.P.L.R. § 5240. The purpose of the applicable provision, CPLR section 5240, is to *protect against* enforcement. *See Guardian Loan Co. v. Early*, 47 N.Y.2d 515, 519 (1979). The CPLR also specifically provides for the modification of an income execution by motion. *See* N.Y. C.P.L.R. § 5231(i).

By its plain language, paragraph 2 of the Stipulation is concerned with preventing Defendants from attempting to suspend enforcement proceedings or modifying or preventing the entry of a judgment enforcing the Stipulation and, presumably, adverse to Defendants. The L&T Application brought by Defendants, however, sought an order enforcing the Stipulation and was, therefore, not a "request or motion . . . for a stay, modification or forbearance of enforcement" of the Stipulation.[25]

Having determined that Plaintiff has proven that Defendants breached paragraph 5 of the Stipulation, the Court turns to damages.

### iv.   Damages

Under New York law, the party "complaining of injury has the burden of proving the extent of the harm suffered." *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 40 (2d Cir. 2009) (quoting *Berley Indus., Inc. v. City of New York*, 45 N.Y.2d 683, 686 (1978)). As discussed above, Plaintiff has established that Defendants breached paragraph 5 of the Stipulation based on the following conditions at the time of the Property's surrender: (1) the tetrachloroethene contamination of the groundwater; (2) the presence of trash and discarded equipment in the backyard; (3) the presence of standing water in the basement; and (4) the

---

[25]  Having resolved Plaintiff's claim pursuant to paragraph 2 of the Stipulation on the merits, the Court denies Defendants' motion for summary judgment as to this claim as moot.

severed and disconnected gas pipes caused by the removal of a ceiling-mounted heating unit in the Building.

Under New York law, when a tenant breaches a covenant to surrender the leased premises in a stipulated condition, the measure of damages resulting from the tenant's breach is the cost of putting the premises in the condition in which it should have been surrendered. *See City of New York v. Penn. R.R. Co.*, 37 N.Y.2d 298, 301 (1975) ("The rule, without variation, is that under such a covenant the damages are what it would cost to put the premises in the required state of repair." (quoting *Mudge v. W. End Brewing Co.*, 145 A.D. 28, 31 (N.Y. App. Div. 1911), *aff'd*, 207 N.Y. 696 (1913))); *Farrell Lines, Inc. v. City of New York*, 30 N.Y.2d 76, 84 (1972) ("It is well established that when an action is brought by a landlord for breach of a covenant to keep in good repair after the expiration of the lease, the cost of accomplishing what should have been done measures the lessor's damages."); *see also In re Hyong Jin Kim*, 15 B.R. 198, 201 (Bankr. S.D.N.Y. 1981) ("The measure of damages in New York State to a leasehold upon the termination of a lease is the reasonable cost of repairs.").

Plaintiff has presented sufficient evidence as to the expense she incurred to remove the trash and equipment discarded in the backyard and to remediate the standing water in the basement. Tobin testified that he hired a company to remove the trash from the backyard at a cost of "about $1,500." (Tr. 41:5–8.) Tobin also testified that he "believe[d] [the cost of remediating the standing water in the basement] was in the area of about . . . $3,000."[26] (Tr. 47:3–7.) As to the groundwater contamination, El Sehamy provided competent testimony that

---

[26]  While the Court found Plaintiff's evidence as to the cost of removing the debris from the Outdoor Space and remediating the standing water in the basement to be limited, Defendants did not raise an evidentiary objection to this evidence. Nor did Defendants scrutinize, or even address, this evidence during cross-examination. Given Defendants' failure to challenge this evidence, the Court accepts it.

the likely cost of remediating the contamination will be $600,000. (Tr. 154:16–155:9.)

Plaintiff did not, however, establish damages attributable to the removal of the ceiling-mounted heating unit. Plaintiff did not present any evidence as to the cost of repairing the severed gas pipes that had been disconnected from the heating unit or of the cost of replacing the heating unit itself. Rather, Plaintiff focused solely on establishing damages allegedly due to a flood but has failed to show that any flood was attributable to a breach of the Stipulation.

Accordingly, Plaintiff established her entitlement to damages in the amount of $604,500 for Defendants' breach of paragraph 5 of the Stipulation. As discussed below, the security deposit, and any interest accrued on the security deposit, will be deducted from this amount.

### c. Defendants' breach of contract claim

In *Tobin II*, Defendants assert a claim for the stipulated amount of the security deposit, $17,421.02, plus interest and attorneys' fees pursuant to paragraph 5 of the Stipulation. (*Tobin II* Compl. ¶ 37.) Because the Court finds that Plaintiff has proven that Defendants breached their obligation to surrender the Property in the condition required under paragraph 5 of the Stipulation based on, among other things, the tetrachloroethene contamination of the groundwater, the Court denies Defendants' motion for partial summary judgment to dismiss Plaintiff's environmental claim. As Plaintiff has substantiated her claim pursuant to paragraph 5 of the Stipulation, Defendants' claim for the security deposit is precluded.

The Stipulation expressly conditions repayment of the security deposit upon, *inter alia*, "full and timely compliance by Beaaro, Ivan Gluck, Phyllis Gluck, Kenneth Gluck and Daniel Gluck with the terms of this [S]tipulation . . . ." (Stipulation ¶ 5.) Defendants have not established the condition precedent, "full and timely compliance," upon which their affirmative entitlement to the security deposit depends and, as discussed above, Defendants cannot make this

showing given their breach of certain obligations under paragraph 5 of the Stipulation. Apparently recognizing this, Defendants' position has evolved. Defendants argue in their post-trial brief that they "do not seek a stand-alone recovery of the deposit" and "ask only that the Court apply the security deposit as a credit against any damages awarded to Tobin . . . ." (Defs. Post-Trial Br. 15.) Plaintiff contends that Defendants are not entitled to a credit in the amount of the security deposit because the Stipulation "specifically states that Beaaro, not Defendants, is entitled to any refund of the deposit."[27] (Pl. Opp'n to Defs. Post-Trial Br. 14.)

The Stipulation expressly provides that the $17,421.02 amount "represents the security deposit heretofore held by the landlord, including accrued interest." (Stipulation ¶ 5.) As such, this amount necessarily represented either a security or liquidated damages. Rasch, *supra* § 13:2 ("A deposit of money or other security to secure payment of rent or performance of the conditions and covenants of the lease on the tenant's part to be performed may constitute a penalty, or, as it is sometimes called, security; or, the deposit may constitute liquidated damages. It is important to ascertain the nature of the deposit."). If a deposit represents liquidated damages, then the amount specified represents the full extent of the tenant's liability upon breach. *See Downtown Harvard Lunch Club v. Racso, Inc.*, 107 N.Y.S.2d 918, 922 (Sup. Ct. 1951) ("Where found to be a provision for liquidated damages the sum specified is recoverable and measures and limits the amount of the recovery."); *see also* Rasch, *supra* § 13:2 ("If a deposit is determined to be liquidated damages for a stipulated breach or breaches of a lease,

---

[27] Plaintiff persists in asserting that because, according to Plaintiff, a judgment was entered on April 9, 2010 in Civil Court, Kings County pursuant to the subsequently-reversed L&T Decision, and remains on record in favor of Beaaro and against Plaintiff for an amount that includes the security deposit, "there is no remaining claim for the deposit." (Pl. Opp'n to Defs. Post-Trial Br. 14 n.6.) The Court considered and rejected Plaintiff's argument regarding claim preclusion on this basis in its March 28, 2014 Memorandum and Order. *Tobin*, 11 F. Supp. 3d at 303–04.

then, upon the occurrence of such breach or breaches, the deposit is immediately forfeited to the landlord as the full measure of the tenant's liability for such breach.").

In the absence of express language providing for liquidated damages, deposits are construed as securities, and a landlord may only resort to the security in the event of breach to the extent of his actual losses. *See Addieg v. Tull*, 187 F. 101, 103–04 (2d Cir. 1911) (holding that, where "money had been held under the old lease as security for damages" contract should be construed to make "good to the defendant his actual loss. To give him more penalizes the plaintiffs, and a forfeiture either by way of the penalty or liquidated damages should only be inflicted when the language clearly requires it"); *Peirson v. Lloyds First Mortg. Co.*, 260 N.Y. 214, 222 (1932) ("This deposit with the defendant was not by way of a transfer of title; it was solely by way of security. Nonperformance by the depositor, in the case of a security deposit, does not vest title in the secured party. It merely gives the secured party the right to resort to the security, but only to the extent of actual indemnification for his loss or damage."); *see also* Rasch, *supra* § 13:2 ("[I]f a deposit is determined to be a penalty, rather than liquidated damages, then it is merely security, or indemnity, for performance. If the tenant breaches his agreement, the landlord is not confined to the deposit for his remedy. But, if he does resort to it, he will be entitled to retain no more of it than will make him whole, that is, indemnify him, for the actual damages he may have sustained by the breach.").

As there is no express language providing for liquidated damages, the Court construes the deposit as a security. Plaintiff is therefore not entitled to retain the security deposit in addition to the damages Plaintiff has established and Plaintiff's judgment will be offset by: (1) $17,421.02, which represents the value of the security deposit with interest as set forth in the Stipulation; and (2) the value of any interest accrued to date on the $17,421.02 amount. (Stipulation ¶ 5; Tr.

8:16–10:4.)

####    d.   Defendants' waiver argument

Defendants claim that Plaintiff has waived the right to raise any claim against Defendants for breaching the Stipulation.[28]  (Defs. Post-Trial Br. 13–14.)  Defendants' position is based on a somewhat convoluted interplay between three different items — (1) paragraph 13 of the Stipulation, (2) paragraph 21 of Defendants' Complaint in *Tobin II* in which Defendants allege that Plaintiff performed according to paragraph 13 of the Stipulation, and (3) paragraph 21 of Plaintiff's Answer in *Tobin II* wherein Plaintiff responds to Defendants' allegations as to her performance under paragraph 13 of the Stipulation.  (*Id.*)  Before turning to the details of Defendants' waiver argument and its merits, it is necessary to set forth each of the foregoing. Paragraph 13 of the Stipulation states:

>   Upon full and timely compliance with all of the terms, conditions and provisions hereof, the attorneys of record for Beaaro and the attorneys for Tobin·in the appeal relating to *Joseph Zafarani v. Kenneth Gluck, Beaaro, Inc. and Helene K. Tobin*, Index No. 17943/04 shall jointly inform the Appellate Division that the dispute has been resolved and that the motion and cross-motion now pending in the Appellate Division are withdrawn.

(Stipulation ¶ 13.)  In support of their claims for the return of the security deposit and specific performance of the Stipulation in *Tobin II*, Defendants' *Tobin II* Complaint sets forth paragraph 13 of the Stipulation and states, "This too was done."  (*Tobin II* Compl. ¶ 21.)  In response, the corresponding portion of Plaintiff's Answer to the *Tobin II* Complaint states:

>   In response to the allegations contained in paragraph 21 of the complaint, respectfully refers the Court and the finder of fact to the document identified therein for its full meaning and import and otherwise denies the allegations in this paragraph of the complaint except admits that the notification to the Appellate Division

---

[28]  Defendants asserted waiver as a claim in Tobin II, and then raised this issue at the trial and again in their post-trial brief.

described therein was made.

(Pl. *Tobin II* Answer ¶ 21.) Defendants' waiver argument is based on what they claim is the combined effect of Plaintiff's answer in *Tobin II*, wherein she "admits that the notification to the Appellate Division described [in paragraph 13 of the Stipulation] was made," and the terms of paragraph 13 of the Stipulation, under which Plaintiff was obligated to provide such notice "[u]pon full and timely compliance with all of the terms, conditions and provisions" of the Stipulation. At the start of the trial, defense counsel set forth Defendants' position stating:

> [Plaintiff] concedes that the notification required to be given to the Appellate Division by both sides when all of the items in the [S]tipulation were complete was made, and that was made by [Plaintiff]. So that should be considered a release of the [D]efendants in the action pending before you of any claims that the items in the [S]tipulation were not done. Otherwise why would you so notify the Appellate Division[?] . . . . [I]t's a concession that the notification required to be given to the Appellate Division was given and there's no question that it was given, and under paragraph 13 of the [S]tipulation, that could only have been given if all aspects of the [S]tipulation which is an issue at this trial have been complied with by [D]efendants. So if that's true, any claim of [Plaintiff] against [Defendants] for violation of the [S]tipulation must fail.

(Tr. 5:1–20.) Defendants did not present any evidence during the trial in support of their waiver claim, but both sides argue their positions in their post-trial briefs.

Defendants contend that Plaintiff's response in her Answer to Defendants' assertion that Plaintiff complied with paragraph 13 of the Stipulation is alone sufficient to establish waiver of any claims of non-compliance by Plaintiff and constitutes a binding admission. (Defs. Post-Trial Br. 13 ("Tobin's admission in the Answer that the joint notice described in paragraph 13 was given is a binding judicial admission . . . .").) Plaintiff contends that Defendants have not established a waiver on her part because the notification Plaintiff provided pursuant to paragraph 13 is not itself in evidence. (Pl. Opp'n to Defs. Post-Trial Br. 12–13.) Plaintiff further contends that Defendants misrepresent the response in her Answer which "refers the Court and the finder

of fact to the document identified [Paragraph 13] for its full meaning and import." (*Id.*)

Under New York law "[a] waiver is the intentional relinquishment of a known right with both knowledge of its existence and an intention to relinquish it . . . . Such a waiver must be clear, unmistakable and without ambiguity." *Prof'l Staff Cong.-City Univ. of N.Y. v. N.Y. State Pub. Emp't Relations Bd.*, 7 N.Y.3d 458, 465 (N.Y. 2006) (quoting *In re Civil Serv. Emps. Ass'n v. Newman*, 450 N.Y.S.2d 901 (App. Div. 1982)). "A contractual right may be waived if it is 'knowingly, voluntarily and intentionally abandoned.' But 'waiver should not be lightly presumed and must be based on a clear manifestation of intent to relinquish a contractual protection.'" *Luitpold Pharm., Inc. v. Ed. Geistlich Söhne A.G. Für Chemische Industrie*, 784 F.3d 78, 95 (2d Cir. 2015) (internal citations omitted) (quoting *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*, 817 N.Y.S.2d 606 (N.Y. 2006)). "The intention to waive [contractual rights] must be clearly established and cannot be inferred from doubtful or equivocal acts or language." *E.M. v. N.Y.C. Dep't of Educ.*, 758 F.3d 442, 459 (2d Cir. 2014) (quoting *WMW Mach., Inc. v. Werkzeugmaschinenhandel GmbH IM Aufbau*, 960 F. Supp. 734, 748 n.11 (S.D.N.Y. 1997)); *Voest–Alpine Int'l Corp. v. Chase Manhattan Bank, N.A.*, 707 F.2d 680, 685 (2d Cir. 1983) (stating that where waiver is not established "directly, unmistakably or unequivocally," issue of intent to waive right is "properly left to the trier of fact").

Defendants have not met their burden to establish that Plaintiff intended to waive her right to assert claims against Defendants for breach of the Stipulation on the basis of Plaintiff's performance pursuant to paragraph 13. Plaintiff's notification to the Appellate Division was not admitted as evidence to the Court and there is no information on the record as to the content of such notification from which this Court can infer that Plaintiff discontinued the proceeding before the Appellate Division because Defendants had fully and timely complied with the terms

of the Stipulation.

### IV. Conclusion

The Court finds that Plaintiff has proven that Defendants breached paragraph 5 of the Stipulation as to some of Plaintiff's specific claims as discussed above, and finds that Defendants owe Plaintiff the amount of $604,500.00, which amount is offset by the amount of the security deposit being held by Plaintiff, and all accrued interest. Plaintiff is therefore entitled to judgment in the amount of $604,500.00 less: (1) $17,421.02, which represents the value of the security deposit with interest as set forth in the Stipulation; and (2) the value of any interest accrued to date on the $17,421.02 amount.

The Court therefore orders judgment in favor of Plaintiff in the amount of $587,078.98. Plaintiff is further ordered to offset the amount of the judgment by the interest accrued to date on the $17,421.02 amount.

The Court denies Defendants' motion for the reasons set forth above.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: September 30, 2015
　　　　 Brooklyn, New York